IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| SOUTH CAROLINA COASTAL CONSERVATION LEAGUE; CHARLESTON WATERKEEPER; SOUTH CAROLINA WILDLIFE FEDERATION | ) ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) | **COMPLAINT** |
| UNITED STATES ARMY CORPS OF OF ENGINEERS, CHARLESTON DISTRICT; LTC ANDREW JOHANNES, in his official capacity as Commander of the Charleston District; LTG SCOTT A. SPELLMON, in his official capacity as Chief of Engineers; CHRISTINE WORMUTH, in her official capacity as Secretary of the U.S. Army; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL REGAN, in his official capacity as Administrator of the U.S. Environmental Protection Agency; UNITED STATES FISH AND WILDLIFE SERVICE; DEB HAALAND, in her official capacity as Secretary of the United States Department of the Interior | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. _2:22-cv-02727-RMG_ |
| Defendants. | ) ) | |

## INTRODUCTION

1.     This action challenges the U.S. Army Corps of Engineers' ("Corps") unlawful issuance of a federal Clean Water Act ("CWA") permit authorizing the filling of approximately 180 acres of ecologically-valuable wetlands for the construction of the Cainhoy Plantation ("Cainhoy" or "the Cainhoy development"), a mixed-use residential and commercial development that will be built off already overcrowded Clements Ferry Road and nearby Highway 41 in Berkeley County. As proposed, the Cainhoy Plantation will locate 45% of its planned housing acreage in the floodplain at a time when the City of Charleston is coping with

the growing problem of sea level rise and flooding, and when the Corps is planning to build a large seawall around the Charleston peninsula to protect against these threats.

2.      The Environmental Protection Agency ("EPA"), as the agency ultimately responsible for implementation of section 404 of the CWA, is responsible for its failure to veto the Corps permit.

3.      The Corps' and EPA's CWA section 404 Permit ("Permit") allowing for the filling of a massive amount of wetlands was issued in violation of the CWA's requirement that any such wetland fills must be the "least environmentally damaging practicable alternative." Here, there were multiple less damaging practicable alternatives presented to the Corps that would have allowed for the Cainhoy Plantation to proceed, but with far less harm to wetlands. These alternatives would have fulfilled the project purpose by creating the same number of housing units while avoiding entirely or dramatically lessening wetlands impacts. In its own decision documents, the Corps deemed these alternatives "feasible." Yet, in violation of the CWA, the Corps approved the Cainhoy Plantation's plan to destroy more than 180 acres of wetlands because it was the developer's preferred method of developing the site.

4.      The Corps also failed to comply with the mandates of the National Environmental Policy Act ("NEPA") in approving this major and highly controversial Cainhoy development, which has significant environmental impacts, including impacts to wetlands, special historic sites, and species listed under the Endangered Species Act ("ESA"), without requiring the preparation of an Environmental Impact Statement ("EIS").

5.      For its part, the United States Fish and Wildlife Service ("the Service") unlawfully issued a Biological Opinion authorizing the extirpation of endangered red-cockaded woodpeckers ("RCWs") from the property. The Biological Opinion arbitrarily defined the action

area to exclude the adjacent Francis Marion National Forest ("FMNF"), and its conclusions about impacts to RCWs (including its failure to establish an adequate trigger for the reinitiation of consultation should impacts to RCWs be greater than planned) are irrational.

6.    Plaintiffs South Carolina Coastal Conservation League, Charleston Waterkeeper, and South Carolina Wildlife Federation (collectively, "Conservation Groups") seek a declaration that the Corps' and EPA's decisions to approve the Permit were arbitrary, capricious, and in violation of the CWA; that the Corps' Environmental Assessment ("EA") is arbitrary and capricious in violation of the Administrative Procedure Act ("APA") and NEPA; the Corps' decision to prepare only an EA for the Cainhoy Plantation was unlawful, arbitrary, and capricious in violation of the APA and NEPA; and that the Service's Biological Opinion is arbitrary and capricious in violation of the APA. Conservation Groups ask this Court to (1) vacate the Corps' and EPA's Permit, EA, and Decision Document (2) vacate the Service's Biological Opinion and Incidental Take Statement, and (3) enjoin Defendants from taking any actions to dredge or fill wetlands under the Permit until Defendants comply with the requirements of the CWA, NEPA, the ESA, and the APA.

## JURISDICTION AND VENUE

7.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (federal officer action), 28 U.S.C. §§ 2201 and 2202 (declaratory judgment), 33 U.S.C. §§ 1361 *et seq.* (CWA), 42 U.S.C. §§ 4321 *et seq.* (NEPA), and 5 U.S.C. §§ 551 *et seq.* (APA).

8.    The violations of law alleged have largely occurred within the District of South Carolina. Venue for this action is proper in this Court pursuant to 28 U.S.C. § 1391 and Local Civil Rule 3.01(A)(1). Venue is appropriate in the Charleston division because the Cainhoy

Plantation is located in the City of Charleston, and because a substantial part of the events and omissions giving rise to the claim occurred at the Corps and Service offices in Charleston. The Charleston District of the Corps and Commander Johannes reside in the Charleston Division and have conducted significant business relating to the Cainhoy development in this Division. The other Federal Defendants are located in Atlanta, GA and Washington, D.C., not other divisions of this District. The Conservation Groups and their counsel are based in the Charleston Division.

## PARTIES

**A.     Plaintiffs**

9.     Plaintiff South Carolina Coastal Conservation League is a not-for-profit corporation founded in 1989. The Conservation League is incorporated under the laws of South Carolina, maintains its headquarters in Charleston, South Carolina, and currently has approximately 1,800 members. Its mission is to protect the natural environment of South Carolina, including wetland, aquatic, and terrestrial habitats and ecologies, and to enhance the quality of life of South Carolina communities by working with individuals, businesses, and government to ensure balanced solutions to environmental problems. The Conservation League seeks to preserve the quality of the natural environment while protecting human health and community livability from mutual threats such as air and water pollution and the fragmentation of human and ecological communities.

10.     Plaintiff Charleston Waterkeeper is a not-for-profit corporation founded in 2008. The Waterkeeper is incorporated under the laws of South Carolina, maintains its headquarters in Mt. Pleasant, South Carolina, and currently has approximately 500 members. The Waterkeeper works to defend and restore local waterways through advocacy, education, and enforcement of

environmental laws. The Waterkeeper is an affiliate of the Waterkeeper Alliance, a global movement of on-the-water advocates who patrol and protect rivers and coasts all over the world.

11.     Plaintiff South Carolina Wildlife Federation is a not-for-profit corporation officially organized in 1946, with operations dating back to 1931. The Wildlife Federation is incorporated under the laws of South Carolina, maintains its headquarters in Columbia, South Carolina, and currently has approximately 2,000 members. The Wildlife Federation works to promote sound stewardship of South Carolina's natural resources. The Wildlife Federation's conservation and education programs focus on protecting habitat for wildlife across South Carolina, from the mountains to the sea. The Wildlife Federation is an affiliate of the National Wildlife Federation, the United States' largest private, nonprofit conservation education and advocacy organization.

12.     Conservation Groups represent the interests of members who live, work, and recreate in the immediate and general vicinity of the proposed Cainhoy development, and have an ongoing interest in protecting wetlands and water quality, and conserving wildlife and wildlife habitat in the areas that would be impacted by the Cainhoy Plantation.

13.     For example, Conservation Groups represent the interests of members, such as Gates Roll, a member of both the South Carolina Coastal Conservation League and South Carolina Wildlife Federation, who use the waters surrounding Cainhoy professionally as fishing guides and recreationally as fishing enthusiasts. Conservation Groups represent the interests of members, such as Mark Joye, a member of the Charleston Waterkeeper, who have grown up using the waters and marshes of the Wando River for recreational boating, fishing, and the general enjoyment of these wild environments. Conservation Groups also represent the interests

of members, such as Dana Beach, a member of the South Carolina Coastal Conservation League, who enjoy birdwatching and generally recreating in the adjacent Francis Marion National Forest.

14.     Conservation Groups and their members have been and continue to be injured by the Corps' and EPA's decisions to authorize discharges to the waters of the United States for the Cainhoy development, including filling and clearing of waters used by Conservation Groups' members, and wetlands and streams connected to waters used by Conservation Groups' members. Had the Corps and EPA permitted and approved one of the less damaging practicable alternatives presented to the Corps during the comment period, these members' harms would have been alleviated.

15.     Conservation Groups and their members are also harmed by the Service's decision authorizing the take of all RCWs on Cainhoy and destruction of RCW habitat adjacent to the FMNF because they enjoy birding trips in and around the national forest to view rare animal and plant species, including RCWs. Conservation Groups are also harmed by the lack of an adequate effects analysis and trigger for the reinitiation of ESA consultation on RCW impacts, as there is no meaningful way to ensure that the impact of the project on RCWs, which these members observe and enjoy, will not be greater than anticipated (or that consultation will be reinitiated if this does occur).

16.     Additionally, Conservation Groups and their members have been and continue to be injured by the Corps' decision not to prepare an EIS as required by NEPA. This procedural failure has prevented them from fully participating in an open and public discussion of the Cainhoy development pursuant to NEPA.

17.     As set forth above, Conservation Groups and their members have recreational, aesthetic, property, and other concrete interests that will be adversely affected and irreparably

harmed by the development of Cainhoy, due to the Corps,' EPA's, and the Service's arbitrary and capricious decision-making.

18.     Conservation Groups and their members will be imminently and irreparably injured unless there is an order from this Court vacating the Corps' and EPA's approval of the Permit, the Corps' EA and Decision Document, and the Service's Biological Opinion and Incidental Take Statement before the development of Cainhoy is undertaken.

19.     Because the challenged decisions in this case are the cause of Conservation Groups' and their members' injuries, an order from this Court vacating these decisions and requiring compliance with the law would redress Conservation Groups' and their members' injuries.

### B.     Defendants

20.     Defendant U.S. Army Corps of Engineers is an agency within the United States Department of Defense charged with permitting construction in waters of the United States through the issuance of section 404 permits. The Charleston District, headquartered in Charleston, South Carolina, is responsible for implementing section 404 of the CWA in South Carolina.

21.     Defendant Lieutenant Colonel Andrew Johannes is the Commander and District Engineer for the Charleston District of the U.S. Army Corps of Engineers, and is sued in his official capacity. He supervises and manages all Charleston District decisions and actions.

22.     Defendant Lieutenant General Scott A. Spellmon is the Commanding General and Chief of Engineers of the U.S. Army Corps of Engineers, and is sued in his official capacity.

23.     Defendant Christine Wormuth is the Secretary of the Army, and is sued in her official capacity as the head of the federal agency that took final agency action challenged by this complaint.

24.     Defendant Environmental Protection Agency is an independent federal agency charged with overall implementation of the CWA, including ultimate responsibility for the protection of wetlands. Oversight of the CWA section 404 permitting program in South Carolina is managed through EPA's Region IV office located in Atlanta, Georgia.

25.     Defendant Michael Regan is the Administrator of the EPA, and is sued in his official capacity as the head of the agency with ultimate responsibility for implementation of the CWA, including oversight of the section 404 permitting program.

26.     Defendant United States Fish and Wildlife Service is a federal agency located within the United States Department of the Interior. The Service is the federal agency that issued the Biological Opinion challenged by this complaint.

27.     Defendant Deb Haaland is the Secretary of the Department of the Interior, and is sued in her official capacity as the head of the federal agency that issued the Biological Opinion challenged by this complaint.

## LEGAL BACKGROUND

### A.     Clean Water Act

28.     In 1972, Congress passed the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this objective, section 301 of the CWA prohibits "the discharge of any pollutant" into "the navigable waters of the United States" except in accordance with permits issued under the CWA. *Id.* §1311(a). "Navigable waters" are defined as "the waters of the United States, including the

territorial sea." *Id*. § 1362(7). "Pollutants" include dredged spoil, rock, dirt, and sand, among other materials. *See id.* §1362(6).

29.     Section 404 of the CWA authorizes the Secretary of the Army to issue permits for the discharge of dredged or fill material into "the waters of the United States" when certain conditions are met. 33 U.S.C. § 1344. The section 404 permitting program is administered by the Corps, with ultimate authority for the program residing with the EPA. The term "waters of the United States" includes wetlands and streams that are tributaries to traditional navigable waters. 33 C.F.R. § 328.3(a) (Corps); 40 C.F.R. § 232.2 (EPA).

30.     Unless exempted by section 404(f)(1), which is not applicable here, all discharges of fill material into waters of the United States, including wetlands, must be authorized under a section 404 permit issued by the Corps.

31.     Issuance of all section 404 permits is subject to the section 404(b)(1) Guidelines found at 40 C.F.R. Part 230. The Guidelines provide particular protection for wetlands, which are defined as "special aquatic sites," *id.* § 230.41, "the degradation or destruction of [which] . . . is considered to be among the most severe environmental impacts covered by [the] Guidelines." *Id*. § 230.1.

32.     The section 404(b)(1) Guidelines provide, *inter alia*, that no discharge of fill material may be permitted if there is a less damaging "practicable alternative" available, or if the discharge will "cause or contribute to significant degradation" of waters of the United States.  40 C.F.R. § 230.10. Factors to determine whether significant degradation will occur include the "[s]ignificantly adverse effects of the discharge of pollutants on human health or welfare, including but not limited to effects on… special aquatic sites" *Id.* § 230(10)(c)(1), and the

"[s]ignificantly adverse effects of discharge of pollutants on recreational, aesthetic, and economic values." 40 C.F.R. § 230(10)(c)(4).

33.     The section 404(b)(1) Guidelines require that the Corps follow a specific two step procedure in applying the practicable alternative standard. First, a correct statement of the project's "basic purpose" is necessary. *See id.* § 230.10(a)(3). The Corps defines a project's basic purpose. *See* 33 C.F.R. Part 325, App. B(9)(b)(4). Second, after the Corps defines the basic purpose of the project, it must determine whether that basic purpose is "water dependent." *See* 40 C.F.R. § 230.10(a)(3). An activity is "water dependent" if it requires access or proximity within a wetland to fulfill its basic purpose. *Id.*

34.     If the activity is not "water dependent," as is the case here, the Guidelines require that the Corps apply a presumption that a practicable alternative with less adverse environmental impact on the wetland is available. *Id.* When this presumption applies, the applicant must then rebut the presumption by "clearly demonstrat[ing]" that a practicable alternative is not available, *id.*, and bears the burden of providing "detailed, clear and convincing information *proving* that an alternative with less adverse impact is impracticable." *Greater Yellowstone Coal. v. Flowers,* 359 F.3d 1257, 1269 (10th Cir. 2004) (internal quotations and citation omitted).

35.     In conducting this analysis, the Corps may rely on information submitted by the applicant but must independently verify such information. *Id.*; 40 C.F.R. § 1506.5(a).

36.     Under the section 404(b)(1) Guidelines, the Corps must not only independently assess the overall project purpose, but also conduct its own "independent evaluation" of practicable alternatives to meet the purpose. *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 543 (11th Cir. 1996). The section 404(b)(1) Guidelines require the Corps to deny a permit unless the applicant can show that there are no practicable alternatives with less adverse impact on the

aquatic ecosystem after consideration of a variety of factors, including: stream impacts (quantitative and qualitative), qualitative wetland function, impacts to other waters (quantitative and qualitative), impacts to threatened and endangered species, and cultural resources. *See* 40 C.F.R. Part 230.

37.     In addition to consideration of practicable alternatives, the 404(b)(1) Guidelines require a permittee to take "all appropriate and practicable steps to avoid and minimize adverse impacts to waters of the United States." 40 C.F.R. §§ 230.91(c)(2), 230.70–.77. Only after such steps are taken is compensatory mitigation permitted "to offset environmental losses resulting from unavoidable impacts to waters of the United States." 40 CFR § 230.93(a)(1).

38.     The Corps is required to conduct a public interest review of the permit application to balance "the benefits which reasonably may be expected to accrue from the proposal" against any "reasonably foreseeable detriment." 33 C.F.R. § 320.4(a)(1).

39.     Regulations for the public interest review require the consideration of all factors that are relevant to the proposal, and the cumulative effect thereof, including: "conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, . . . conservation, water quality, . . . and, in general, the needs and welfare of the people." 33 C.F.R. § 320.4.

40.     Pursuant to the U.S. Court of Appeals for the Fourth Circuit's decision in *National Wildlife Federation v. Hanson*, "both the Corps and the EPA are responsible for the issuance of permits under the CWA and enforcement of their terms. . . . The EPA is ultimately responsible for the protection of wetlands." 859 F.2d 313, 315-16 (4th Cir. 1988). In the Fourth Circuit, citizens may sue the EPA Administrator and the Corps "when the Corps abdicates its responsibility." *Id*. at 316.

B.        **National Environmental Policy Act**

41.        NEPA, 42 U.S.C. §§ 4321 *et seq*., is "our basic national charter for protection of

the environment." 40 C.F.R. § 1500.1 (1978). NEPA requires federal agencies to take a hard

look at the environmental consequences of an agency action before proceeding with that action.

*See* 42 U.S.C. §§ 4321, 4332(2)(C); 40 C.F.R. §§ 1501.2 (1978), 1502.5 (1978).

42.        Under applicable Council of Environmental Quality ("CEQ") regulations,[1]

"[m]ajor Federal action" requiring NEPA review is defined to "includ[e] actions with effects that

may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R.

§ 1508.18 (1978). "Actions include new and continuing activities, including projects and

programs entirely or partly . . . regulated[] or approved by federal agencies." *Id*.

43.        The Corps' and EPA's issuance of the Permit for the Cainhoy Plantation is a

major Federal action subject to NEPA review.

44.        For "major Federal actions" significantly affecting the quality of the human

environment, NEPA requires that federal agencies prepare an EIS. *See* 42 U.S.C. § 4332(2)(C).

Where it is not readily discernible whether the environmental effects of a proposed action will be

significant, federal agencies may first prepare a less-rigorous EA to establish the project's level

of impact. *See* 40 C.F.R. §§ 1501.4(b) (1978), 1508.9(a)(1) (1978); 33 C.F.R. §§ 230.10–.11. If

the impacts assessed in an EA are likely to be significant, then the federal agency must prepare a

full EIS.

---

[1] Though amended by the recent "Update to the Regulations Implementing the Procedural Provisions of NEPA," 85 Fed. Reg. 43304 (July 16, 2020), the NEPA regulations cited within this complaint continue to guide review of the Cainhoy development permitting, which had been underway for years before the new regulations. Courts across the nation continue to apply this version of the NEPA regulations, and the Corps relied on these regulations in this case.

45.     "Significan[ce]" depends on a number of factors, including impacts that may be beneficial or adverse, proximity to wetlands and rivers, presence of unique or uncertain risks, and the possibility for adverse effects on an endangered or threatened species. 40 C.F.R. § 1508.27 (1978). The presence of any one of these factors is sufficient to require an EIS.

46.     An agency's NEPA analysis must include a "full and fair discussion" of all direct and indirect environmental impacts, 40 C.F.R. §§ 1502.1 (1978), 1508.8 (1978), and consider the cumulative effects of past, present, and reasonably foreseeable activities in combination with the proposed action. *Id*. § 1508.7 (1978).

47.     Direct effects are "caused by the action and occur at the same time and place," whereas indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id*. § 1508.8 (1978).

48.     Cumulative effects are "the impact on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Id*. § 1508.7 (1978).

49.     An agency's NEPA analysis must also analyze reasonable alternatives that would avoid or minimize the action's adverse impacts, *id*. § 1502.1 (1978), and set out measures to mitigate those adverse effects, *id*. § 1502.14(f) (1978).

50.     The agency's alternatives analysis must "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Id*. § 1502.14 (1978).

C.    **Endangered Species Act**

51.    "In response to growing concern over the extinction of many animal and plant species, Congress enacted the Endangered Species Act of 1973." *Gibbs v. Babbitt*, 214 F.3d 483, 487 (4th Cir. 2000) (citation omitted). Congress' response was "powerful and substantially unequivocal." *Loggerhead Turtle v. Cty. Council of Volusia Cty.,* 148 F.3d 1231, 1246 (11th Cir. 1998), *cert. denied*, 526 U.S. 1081 (1999) (citation and quotations omitted). Indeed, the ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).

52.    "'The plain intent of Congress in enacting this statute . . . was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute.'" *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Ore.*, 515 U.S. 687, 699 (1995) (quoting *Hill*, 437 U.S. at 184). "[E]xamination of the language, history, and structure of the legislation . . . indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Hill*, 437 U.S. at 174.

53.    Recognizing these species' "esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people," 16 U.S.C. § 1531(a)(3), the ESA set out "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species," *id.* § 1531(b). The purpose of the statute is to recover these species to a healthy status. *See id.* § 1532(3) ("conservation" and "conserve" mean "to use and the use of all methods and procedures which are necessary to bring any endangered

species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary").

54.     Principal responsibility for implementing the requirements of the ESA have been delegated to the Service, an agency within the Department of the Interior, and to the National Marine Fisheries Service ("NMFS"), an agency within the Department of Commerce.

55.     Section 7(a)(2) is a critical component of the ESA's statutory and regulatory scheme to conserve endangered and threatened species. It requires federal agencies to "insure" that the actions that they fund, authorize, or undertake "[are] not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of their designated "critical habitat." 16 U.S.C. § 1536(a)(2); *see* 50 C.F.R. Part 400. In order to fulfill this substantive mandate, section 7(a)(2) and its implementing regulations require that federal agencies engage in "consultation" with either NMFS or the Service, depending on what species might be affected by the action. 16 U.S.C. § 1536(a)(2). The agency's determination as to whether the federal action is likely to jeopardize a listed species,or destroy or adversely modify its designated habitat is set forth in a biological opinion. *See* 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h).

56.     In formulating a biological opinion, "environmental context is critical. If the Fish and Wildlife Service conducted its 'jeopardy analysis in a vacuum,' focusing only on the individual agency action at issue, then 'a listed species could be gradually destroyed, so long as each step on the path to destruction [wa]s sufficiently modest.'" *Appalachian Voices v. U.S. Dep't of the Interior*, 25 F.4th 259, 269 (4th Cir. 2022) (quoting *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 929–30 (9th Cir. 2008) (citations omitted).

57.    Accordingly, "[the Service] must '[e]valuate' four different categories of information: (1) the 'current status' of the listed species; (2) the 'environmental baseline'; (3) the 'cumulative effects' of non-federal actions; and (4) the [indirect and direct] 'effects of the [agency] action.'" *Id.* (quoting 50 C.F.R. § 402.14(g)(2), (3)). "Climate change typically must form part of the analysis," as well. *Id.* at 271; *see S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.,* 723 F. Supp. 2d 1247, 1274 (E.D. Cal. 2010) (listing cases "[holding] that failure to discuss the impacts of climate change rendered [biological opinions] arbitrary and capricious"). The project's indirect and direct effects in turn determine the "action area." 50 C.F.R. § 402.02.

58.    The Service must then "*[a]dd* the effects of the action and cumulative effects to the environmental baseline and[,] *in light of* the status of the species and critical habitat, formulate [its] opinion as to whether the action is likely to jeopardize the continued existence of [the] listed species." *Appalachian Voices,* 25 F.4th at 271. "In effect, [the Service] must make its jeopardy determination while viewing the action 'against the aggregate effects of everything that has led to the species' current status and, for non-Federal activities, those things [likely] to affect the species in the future.'" *Id.* (quoting U.S. Fish & Wildlife Service and National Marine Fisheries Service, Endangered Species Consultation Handbook at 4-35 (March 1998)).

59.    If the Service concludes that the proposed action is not likely to result in jeopardy to a species, it must provide the action agency with an "incidental take statement." 16 U.S.C. § 1536(b)(4), (o); 50 C.F.R. § 402.14(i).

60.    The ESA requires that the action agency report back to the Service on an action's progress and its impacts on listed species, as specified in the incidental take statement, in order to

monitor the impacts of project. *See* 50 C.F.R. § 402.14(i)(3). Consultation must be immediately reinitiated if the amount or extent of incidental taking is exceeded. *Id*. §§ 402.14(i)(4), 402.16(a).

61.     To ensure an incidental take statement functions properly, "[the Service] must set 'a clear standard for determining when the level of anticipated take has been exceeded.'" *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 272 (4th Cir. 2018) (quoting 50 C.F.R. § 402.14(i)(1)(i)). "The requirement to include a trigger for reinitiation of consultation necessitates more than lip service [and] [t]he lack of a clear trigger point to reinitiate consultation renders [a biological opinion] unlawful." *Am. Rivers v. FERC*, 895 F.3d 32, 48–49 (D.C. Cir. 2018).

### D.    Administrative Procedure Act

62.     The APA provides for judicial review of the actions and decisions of federal agencies. "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

63.     "An agency rule [is] arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

64.     Under section 706(1) of the APA, the reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Under section 706(2) of the APA, the reviewing court shall "hold unlawful and set aside agency action, findings, and

conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706(2).

65.    As detailed by the Supreme Court in *Bennett v. Spear,* 520 U.S. 154 (1997), claims challenging erroneous biological opinions or incidental take statements issued by the Service are reviewable under the APA.

## STATEMENT OF FACTS

### A.    Cainhoy Property and Development

66.    The Cainhoy Plantation is a 9,076-acre property in the City of Charleston and Berkeley County on the north and south sides of Clements Ferry Road.



67.     Over half of the acreage of the Cainhoy property is wetlands, including the approximately 180 acres of wetlands that will be destroyed for construction of the Cainhoy development. Upon information and belief, this is one of the largest wetlands fills for a mixed-use residential/commercial development permitted by the Charleston District of the Corps in recent history.

68.     The southern boundary of Cainhoy is the Wando River, which provides prime habitat for a wide array of wildlife, and is a productive fishery.

69.     Cainhoy shares over a two-mile border with the ecologically invaluable FMNF, which is home to a variety of endangered, threatened, or at-risk animal and plant species, including the endangered RCWs, threatened northern long-eared bats, and frosted flatwood salamander.

70.     Cainhoy serves as a vital wildlife corridor between the FMNF and the Cooper River.

71.     2,850 acres of Cainhoy are contiguous old-growth longleaf pine forest, an especially important and at-risk habitat in the Southeast and important habitat for RCWs.

72.     Construction of the Cainhoy Plantation would result in a large mixed-use residential and commercial development that would include at least 9,000 housing units and an estimated 45,000 occupants.

73.     The Cainhoy Plantation places 45% of the development's housing acreage within the 100-year floodplain.

74.     Construction of the Cainhoy Plantation will degrade the 2,850 acres of contiguous old-growth longleaf pine forest on the property and result in the "take" of all RCWs on the property.

75.    In addition to destroying 180 acres of pristine wetlands, placing a large amount of housing in the floodplain, and taking endangered species, the Cainhoy development will contribute to Charleston's continuing problems with flooding and sea level rise.

76.    The Cainhoy Plantation is one of the most ecologically and historically important undeveloped tracts left in coastal South Carolina. The southern portion of the property borders the Wando River and large stretches of marsh. As sea levels continue to rise, if left intact, the Cainhoy marshes would migrate upland on undeveloped land, preserving the invaluable benefits and resources associated with the unique marsh habitat.

77.    The City of Charleston has recently enacted a comprehensive City Plan that highlights the avoidance of development in the floodplain. Specifically, the City Plan recommends that city developments "[r]educe densities on low-lying areas vulnerable to flooding, and eliminate development in future marsh migration areas." City of Charleston, Charleston City Plan at 146 (adopted Oct. 12, 2021), https://www.charleston-sc.gov/DocumentCenter/View/31227/Final-City-Plan-Adopted-October-12-2021.

78.    Rather than provide an adequate buffer zone from sea level rise and the storm surge that the Corps fears on the Charleston peninsula (and for which the Corps is proposing to construct a $1.1 billion seawall), the Cainhoy Plantation places substantial development in close proximity to the current water line. This development not only endangers the long-term viability of the adjacent marshes as sea levels rise, but it also endangers the residents of the development during flooding and storm surge events in the present day and into the future.

79.    The Cainhoy Plantation would also destroy or impair sites eligible for the National Register of Historic Places, such as the St. Thomas & St. Denis Church and the Phillips Community.

20

80.     The Cainhoy Plantation threatens the Jack Primus community, a traditional African American settlement community that is still primarily inhabited by the descendants of the formerly enslaved peoples who founded the community following their emancipation. The Jack Primus community is historically and culturally significant for its intact land use and settlement patterns.

**B.     The Section 404 Permit**

**Permit Application and Comment Period**

81.     The Applicants applied for the Permit from the Corps on March 7, 2018.

82.     The Corps advertised the Cainhoy development for public comment on March 21, 2018.

83.     Conservation Groups provided comments on the Permit on September 19, 2018. *See* Exhibit 1.

84.     With another letter on September 1, 2020, Conservation Groups provided the Corps with an extensive report by Dover, Kohl & Partners ("Dover Kohl"), which analyzed potential alternative plans that could offer equal development benefits with less environmental harm. *See* Exhibit 2. These plans demonstrated that the applicants' proposal was not the least environmentally damaging practicable alternative.

85.     The Dover Kohl report included four alternative development scenarios for Cainhoy. Dover Kohl's three alternatives with 9,000 housing units ranged from (1) over 4,000 lots with 13.2 acres of wetland impacts; (2) just under 4,000 lots with 11 acres of wetland impacts; to (3) around 3,300 lots with 5.2 acres of wetland impacts. Dover Kohl's alternative with 6,000 housing units had no wetland impacts at all and only 17% of development acreage in the floodplain.

21

86.    Conservation Groups provided more comments on October 21, 2020, urging the Corps to prepare a full EIS on the Cainhoy Plantation and explaining the ESA harms that would flow from the development. *See* Exhibit 3. Conservation Groups explained that "the proposed Cainhoy development ticks every single box for a 'significant' action requiring an EIS." *Id.* at 2. Conservation Groups further elaborated their concerns regarding flooding, marsh migration, infrastructure, and endangered and threatened species, as well as their concerns that the Cainhoy development would fail to comply with the requirements of the CWA. *See id.* at 3–8, 13–16.

87.    Conservation Groups submitted a final comment letter on October 20, 2021, to apprise the Corps of the City of Charleston's recently enacted City Plan that disfavors development in the floodplain and highlights the importance of leaving open space for marsh migration as sea levels rise. *See* Exhibit 4.

**The Corps' Decision Document**

88.    The Corps signed its Decision Document approving the Cainhoy Plantation, the Memorandum for the Record, and the Environmental Assessment on May 6, 2022.

89.    The Corps defined the basic project purpose as "to construct a mixed use development to include residential, commercial, educational, office and government facilities." Decision Document at 14.

90.    The Corps defined "[t]he overall project purpose [as] to construct a mixed use development to include residential, commercial, educational, office and government facilities with access to major traffic arteries that has the demographic support, zoning, infrastructure and access to schools and hospitals to help meet the needs of the growing Charleston, South Carolina metropolitan area." *Id.*

22

91.     The Corps found that the activity "does not require access or proximity to or siting within a special aquatic site to fulfill its basic purpose. Therefore, the activity is not water dependent." *Id.*

### Alternatives Analysis

92.     In the Decision Document, the Corps conducted an alternatives analysis considering 9 off-site alternative sites around the Charleston area. *See id.* at 101.

93.     The Corps explained that "[i]n order to be practicable, an alternative must be available, achieve the overall project purpose (as defined by the Corps), and be feasible when considering cost, logistics and existing technology." *Id.* at 100.

94.     The "[c]riteria for evaluating alternatives as evaluated and determined by the Corps" included a requirement that all sites contained a minimum of "7,500 [acres] **with 5,000 acres developable uplands**," among other required features such as proximity to an interstate or highway and to downtown Charleston. *Id.* at 100–01 (emphasis added).

95.     The Corps concluded that Cainhoy "me[t] the site selection/screening criteria for size" because "[t]h[e] site totals 9,375 acres and has 5,585 acres of uplands . . . ." *Id.* at 107, 128.

96.     However, the Corps' own wetland delineation of Cainhoy found a total of 4,546.2 acres of uplands, over 1,000 acres short of the number cited in the EA and almost 500 acres short of the criterion the Corps "evaluated and determined" to be necessary for any alternative to be suitable. *Id.* at 100.

97.     The Corps thus permitted the Cainhoy development despite this alternative's failure to meet the agency's own criteria for satisfying the project purpose.

### *The Least Environmentally Damaging Practicable Alternative*

98.     The Corps also permitted the Cainhoy development when this proposal was not the least environmentally damaging practicable alternative.

99.     The Corps found that "the Dover [Kohl] Plan *could* be a feasible development design…" yet went on to reject this alternative as not "the intent of the applicants, nor what the applicants have proposed…" Decision Document at 133 (emphasis in original).

100.     The only criterion that the Dover Kohl plan fails to satisfy is the site size criterion. But the selected Cainhoy development also fails to satisfy this criterion, as discussed above in paragraphs 96–97.

101.     Of the other criteria, the Dover Kohl plan satisfies each one: it is located within 50 miles of Charleston with a commuter time of 45 minutes or less, it is within a 10-mile radius of an interstate or four lane major highway, it is attainable, it has access to utilities infrastructure, and it is appropriately zoned for mixed-use development.

102.     Further, the Dover Kohl plan satisfies the project purpose because it would construct a mixed-use development to include residential, commercial, educational, office and government facilities with access to major traffic arteries that has the demographic support, zoning, infrastructure and access to schools and hospitals to help meet the needs of the growing Charleston, South Carolina metropolitan area.

103.     The Corps concluded that "because the Dover Plan is inconsistent with the overall project purpose, it is not considered to be a practicable on-site alternative for the Cainhoy Plantation property in light of overall project purpose." *Id*. at 133–34.

104.     The Corps did not cite any specific reason why the Dover Kohl plan was inconsistent with the overall project purpose.

105.    The Dover Kohl plan satisfies every aspect of the project purpose, but with far fewer impacts to wetlands.

### *Significant Degradation*

106.    The Corps Permit allows for the significant degradation of wetlands in violation of the CWA and Guidelines.

107.    Human health and welfare are directly implicated by filling wetlands to place thousands of homes within the floodplain. These homes will be unnecessarily susceptible to flooding and storm surge; the Corps fully recognizes the dangers of storm surge in Charleston and is currently proposing a storm surge wall to surround the low-lying Charleston peninsula. Wetlands act as a buffer from storms, and the destruction of wetlands only makes future residents more vulnerable.

108.    Included in the consideration of health and human welfare is the consideration of effects on special aquatic sites. *See* 40 C.F.R. § 230.10(c)(1).

109.    Wetlands are considered "special aquatic sites" under the Guidelines. *Id*. § 230.41.

110.    The Corps' response to a Freedom of Information Act request spanning ten years of Charleston District Corps permits reveals the significance of the impacts the Cainhoy Plantation will have on these special aquatic sites. Over a ten-year span, the Corps issued 4,102 permits for development projects totaling 1,026 acres of wetland fill.

111.    Cainhoy alone represents nearly 18% of the development impacts authorized over ten years.

112.    Beyond impacts to human health and welfare, the Cainhoy development would also have significant adverse effects on the recreational, aesthetic, and economic values of the Cainhoy peninsula.

113.     The waters surrounding Cainhoy provide excellent opportunities to the public for recreational fishing. The areas of the FMNF which are adjacent to the eastern edge of Cainhoy are some of the most biologically diverse of the entire forest, thus providing prime areas for exploration by naturalists. The introduction of what essentially amounts to a new city along those waters and neighboring those areas of the forest would cause irreparable harm to those recreational interests.

114.     Lastly, the substantial amount of the Cainhoy development unnecessarily placed in locations vulnerable to future sea level rise, flooding and storm surge, will have significant adverse economic effects for future residents.

### *Avoidance and Minimization*

115.     During its permitting process, the Corps was presented with the comments of multiple agencies explaining that the Cainhoy development did not adequately avoid and minimize impacts to waters of the United States.

116.     Both the South Carolina Department of Natural Resources ("SCDNR") and NMFS advocated for additional avoidance and minimization efforts. *See* Decision Document at 84.

117.     SCDNR's final comment letter on the Cainhoy Plantation stated that SCDNR "continues to find that the best use for this property, based on the ecological functions and unique resources located there, would be conservation." *Id.*

118.     SCDNR's final letter also stated that SCDNR "continues to recommend that additional efforts are made to further avoid and minimize project impacts before consideration for compensatory mitigation." *Id.* No further wetland avoidance or minimization was achieved in response to SCDNR's final letter.

119.    Likewise, NMFS commented that it "fully concurs" with SCDNR's comments, *id.* at 71, and NMFS commented on its own behalf that "[t]he[ ] cumulative impacts [of docks on tidal creeks] must be assessed as part of the EFH assessment and real avoidance and minimization strategies developed for the project." *Id.* at 85. Despite the certainty that future residents will construct docks in tidal creeks, the Corps concluded that it did not have to evaluate those impacts before issuing the Permit because "[t]he applicant has not included any proposed docks in their DA application." *Id.* at 199.

120.    Other expert agencies have asserted that further avoidance and minimization is possible, and the Dover Kohl plan demonstrates that further avoidance and minimization of wetlands impacts on the property is, in fact, possible.

### *Public Interest Review*

121.    In conducting its public interest review, the Corps concluded that "[t]he benefits resulting from this proposal will assist in meeting the needs of the growing Charleston metropolitan population and will outweigh the detriments of the proposal." *Id.* at 165.

122.    To the contrary, the detriments of the Cainhoy Plantation far outweigh any claimed benefits.

123.    The majority of the public benefits claimed by the Corps are not benefits at all, but rather mitigation measures intended to balance out the harms of the proposed development or avoid further detriment.

124.    The proposed Point Hope Nature Sanctuary and the preservation of on-site wetlands, for example, were proposed by the Applicants to satisfy mitigation requirements contained in the CWA. The land comprising the Point Hope Nature Sanctuary is already

undeveloped habitat, and its continued protection does not serve the national goal of no net loss of wetlands.

125.    The same can be said for the on-site wetlands slated for preservation. These resources will ultimately be degraded despite their "preservation" as part of the Cainhoy development. The proliferation of roads, homes, and other infrastructure around the Point Hope Nature Sanctuary and on-site wetlands will result in pollution, fragmentation and isolation, and other adverse effects, degrading these landscapes and their ecosystem services over time.

126.    The Dover Kohl analysis also demonstrates that the public interest can be achieved by constructing equal numbers of housing units but with far fewer wetlands impacts.

127.    The Corps' public interest review failed to consider relevant factors, including the dramatic impact the Cainhoy development will have on wetlands and the resulting flood hazards and impacts to floodplain values. The Corps Permit allows 45% of the development acreage to be constructed in the 100-year floodplain and at risk of inundation, a risk that grows as sea levels continue to rise due to climate change.

**C.    EPA Review of the Permit**

128.    In an email to the Corps on May 3, 2018, EPA acknowledged that "the impacts are large" and requested clarification on five issues through a series of bullet points. *Id.* at 65.

129.    Those issues were: (1) the 50-year permit term, (2) a 5-6-acre wetland near the Point Hope Nature Sanctuary; (3) the qualifications of the steward for the land trust; (4) the expected dock restrictions and allowances; and (5) the measurement of wetlands restoration success. *See id.* at 65–66.

130.    The Corps sent the Applicants' response to EPA on August 26, 2019. *See id.* at 70.

131.    In an email to the Corps on September 25, 2019, EPA wrote that "[a]s the wetland impacts of the project are still large (approx. 182ac), EPA would welcome additional avoidance and minimization but we appreciate the applicant addressing all five of our previous comments and offer no additional comments at this time." *Id.*

132.    EPA failed to opine on, or consider, the Dover Kohl alternatives demonstrating that the Cainhoy development was not the least damaging practicable alternative. EPA also failed to object to or veto the Permit.

**D.    The Corps' NEPA Compliance**

133.    The Corps issued an EA for the Cainhoy Plantation, declining to prepare an EIS.

134.    In the EA, the Corps defined the scope of analysis for purposes of NEPA as "the entire 9,076-acre property, including both uplands and wetlands, due to the extent and configuration of the wetlands that will be impacted by this project." *Id.* at 10.

135.    The Corps concluded that an EIS was not required because the permitted action would not have a significant impact on the quality of the human environment.

136.    In reaching its finding of no significant impact, the Corps explained that although the impacts to 181.5 acres of wetlands "could be considered to have potentially significant impacts," the compensatory mitigation plan offsets adverse effects "such that the net result would be less than significant impacts to the quality of the human environment." *Id.* at 213

137.    The Corps' finding of no significant impact disregarded the significant impact the Cainhoy development will have on wetlands, endangered species, public safety, historic and cultural resources, and ecologically critical areas.

### E.     The Service's Biological Opinion

138.     On May 23, 2018, the Corps initiated formal consultation with the Service on the Permit for Cainhoy regarding impacts to endangered RCWs. Biological Opinion at 1.

139.     Red-cockaded woodpeckers were listed as endangered in 1970 and at the time of listing, fewer than 10,000 individuals remained. *Id.* at 8–9. An almost complete loss of habitat was the primary driver of RCW decline due to extensive cutting, conversion of forest land to agriculture and other non-forest uses, and fire suppression. *Id.* at 9, U.S. Fish and Wildlife Service, Special Status Assessment Report For the Red-cockaded Woodpecker at 73 (2020), https://ecos.fws.gov/ServCat/DownloadFile/188805 ("2020 SSA"). The primary threats identified in the Recovery Plan for the RCW all had the same basic cause—lack of suitable habitat. Biological Opinion at 13.

140.     "The life history of RCWs is closely tied to the occurrence of fire-maintained old growth pine forests that once dominated the southeastern United States." *Id.* at 9. "Only 3 million acres of longleaf pine forest remain of the estimated 60 to 92 million acres once in existence" due to "harvesting for agriculture, short timber rotations, and the suppression of fire, [which] reduced the amount and quality of RCW foraging and nesting habitat." *Id.*

141.     Today, the longleaf pine ecosystems on which RCWs depend "are [ ] among the most endangered systems on earth." 2020 SSA at 73. "Many ecologists consider fire suppression to be the primary reason for the degradation of remaining longleaf pine forests." U.S. Fish and Wildlife Service, Francis Marion National Forest Revised Land Management Plan Biological Opinion at 34 (2016), https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd531030.pdf.

142.     Cainhoy has nearly 3,000 acres of contiguous longleaf pine habitat. Biological Opinion at 5.

143.     Although RCW population numbers have improved since their listing in 1970, the majority of RCW populations still have low to very low resilience to withstanding impacts. 2020 SSA at 106–08, 117.

144.     On November 15, 2018, the Service issued a Biological Opinion for the Cainhoy Plantation.

145.     In the Biological Opinion, the Service limited, without explanation, the action area to Cainhoy Plantation, the on-site compensatory mitigation areas, Cheeha Combahee Plantation, Ashepoo Plantation, and Hitchcock Woods. Biological Opinion at 5.

146.     The Service did not include the FMNF in the action area.[2] *Id.*

147.     Cainhoy shares a two-mile border with the FMNF, a national forest that is home to many species protected by the ESA, including RCWs, northern long-eared bats, and frosted flatwoods salamanders. Biological Opinion at 4

148.     The RCW Recovery Plan designated 13 primary core populations, including the FMNF population. *Id.* at 14.

149.     The Cainhoy RCWs are demographically connected to the FMNF population and the two populations function in concert with each other. *Id.*, *see also* Letter from Dr. J.H. Carter III, Environmental Consultant, to Christopher DeScherer, SELC, 3–4 (Oct. 21, 2020) (Exhibit 5) ("Carter Letter"); Letter from Ralph Costa, RCWO LLC, to Susan Smythe, Womble Bond Dickson, LLC, 3–4 (Sept. 18, 2020) (Exhibit 6) ("Costa Letter").

---

[2] Confusingly, the Service correctly included in FMNF when is assessed the environmental baseline; that is, the current status of the species in the action area. Biological Opinion at 13–16.

150.    The Cainhoy RCWs provide fledgling recruitment to the FMNF population and in turn support the demographic stability of the FMNF population. Biological Opinion at 25, Carter Letter at 3–4, Costa Letter at 3–4.

151.    Without the Cainhoy Plantation RCWs and habitat, the FMNF RCWs near Cainhoy will become edge groups, which tend to be less stable. Carter Letter at 3–4, Costa Letter at 3–4.

152.    While failing to include the FMNF that abuts the site in the action area, the Service included two plantations in the Ashepoo, Combahee, and Edisto Basin ("ACE Basin")—Cheeha Combahee Plantation and Ashepoo Plantation—and Hitchcock Woods in Aiken, which are over 30 miles away from the Cainhoy development. Biological Opinion at 5. These areas were included because the Applicants funded translocations of RCWs from the FMNF to those three properties in an effort to offset the eventual extirpation of RCWs from Cainhoy. *Id.*

153.    The translocations established new RCW colonies in the ACE Basin and Hitchcock Woods.

154.    As of May 2018, SCDNR noted that the population growth for these new colonies appeared weak. Decision Document at 34–35. The new populations will also remain small and isolated from larger demographic populations.

155.    Turning to project impacts, the Service considered beneficial, indirect, direct, and cumulative effects. Biological Opinion at 24–26.

156.    The Service cited the translocations as beneficial effects, as well as the Applicants' agreement to provide appropriate habitat management activities for RCWs on the property for as long as development plans allow. Biological Opinion at 24–25. The Service also

noted that the Applicants' agreement to not immediately extirpate all RCWs on Cainhoy would benefit the greater FMNF population by providing continued recruitment. *Id*.

157.     The Service determined that direct effects of the action included land clearing efforts and real estate development activities within occupied RCW habitat that would result in the incidental take of RCW clusters due to habitat destruction. Biological Opinion at 25.

158.     In assessing indirect effects, the Service stated that those effects "include the reduction of future RCWs in the Cainhoy population available to replace breeding vacancies in the remaining Cainhoy RCW groups[,] . . . increase[ing] their likelihood of extirpation prior to [direct habitat destruction from] . . . real estate development*." Id.* That is, with each cluster that the development takes, the remaining clusters on the property are increasingly less likely to survive long enough to be directly impacted by habitat clearing.

159.     The Service did not consider any direct or indirect effects to the FMNF of placing a large-scale development next to the forest or of eliminating RCWs and RCW habitat on the property, including effects from reduced fledgling recruitment, loss of foraging habitat, or creation of edge habitat.

160.     The Service also failed to consider the impact of fire suppression on FMNF fire-dependent species, like RCWs. The U.S. Forest Service Regional Fire Ecologist provided comments to the Service stating that "the Cainhoy Plantation . . . could considerably negatively impact the needed management of fire-adapted threatened and endangered species on the [FMNF]" and emphasizing that the Forest Service "needs to continue burning the area adjacent to and within several miles of the proposed Cainhoy development, and the development may seriously affect [the Forest Service's] opportunities to do so." Email from Beth Buchanan, U.S. Forest Service, to Rhea Whalen, U.S. Forest Service (Nov. 1, 2018) (Exhibit 7).

161.    The Service also failed to consider climate change impacts. Climate change will lead to RCW habitat degradation and/or loss in myriad ways, including increased storm intensity, habitat destruction, and heat waves. 2020 SSA at 90, 121.

162.    Following the effects analysis, the Service determined that the Cainhoy development would result in the loss of 11 RCW clusters on Cainhoy. Biological Opinion at 26.

163.    The Service concluded that take of 11 RCW clusters would not jeopardize the continued existence of the species because 11 RCW clusters represent less than 2% of the larger Mid-Atlantic demographic population, and the loss of 11 groups "[would] not significantly reduce the FMNF-Bonneau Ferry WMA-Santee Coastal Reserve WMA demographic population." *Id.*

164.    The Incidental Take Statement included in the Biological Opinion set the take limit as 11 RCW clusters and directed the Corps to reinitiate consultation if the amount or extent of take is exceeded. *Id.* at 27, 29.

165.    However, the Biological Opinion also stated that the Service "offer[ed] the Applicants 'Safe Harbor-like Assurances' that no further regulatory obligations will be necessary if additional occupation by RCWs occur on Cainhoy Plantation." *Id.* at 24, *see also* Decision Document at 34 ("The Biological Opinion includes safe harbor like assurances and allows for the take of [11] baseline [clusters], above baseline [clusters,] *and* future RCW groups on Cainhoy Plantation for the life of the permit.").

166.    That is, the Service authorized take of more than 11 RCW clusters, without considering whether take of more than 11 RCW clusters would jeopardize the continued existence of the species or significantly reduce the FMNF-Bonneau Ferry WMA-Santee Coastal Reserve WMA demographic population.

167.    It is also unclear whether the Corps must reinitiate consultation if more than 11 RCW clusters are taken.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Violation of CWA – Corps Unlawfully Violated Section 404 of the CWA and Applicable Regulations)**

168.    Plaintiffs incorporate by reference all preceding paragraphs.

169.    The CWA requires the preparation of an alternatives analysis before the issuance of any section 404 permit.

170.    As part of the Cainhoy alternatives analysis, the Corps developed criteria to measure the practicability of each possible development site.

171.    One of these criteria required 5,000 acres of developable uplands on any potential development site.

172.    The Cainhoy Plantation has just over 4,500 acres of developable uplands, but the Corps arbitrarily explained that Cainhoy satisfied this criterion and unlawfully issued the Permit for the Cainhoy development.

173.    The Corps also wrongly determined that the Cainhoy development was the least environmentally damaging practicable alternative in the face of record evidence—namely the Dover Kohl plan—demonstrating the existence of alternatives that even the Corps admitted were "feasible" and which would have far fewer impacts to wetlands.

174.    The Corps also violated the CWA by issuing the Permit for the Cainhoy Plantation that will result in significant degradation—the destruction of over 180 acres of wetlands—to waters of the United States, including impacts to Aquatic Resources of National Importance.

175.    The Corps also violated the CWA by approving the Cainhoy Plantation Permit without a demonstration that the applicant has taken all practicable steps to avoid and minimize impacts to waters of the United States. Again, the Dover Kohl plan and the comments of other expert agencies demonstrate the lack of avoidance and minimization.

176.    Finally, the Corps' public interest review violated the CWA because it failed to consider that the housing needs in the growing Charleston area could be satisfied by the Dover Kohl plan with far fewer wetlands impacts and far fewer homes placed in the floodplain.

177.    The Corps' public interest review also failed to consider the unnecessary placement of thousands of homes in the floodplain. A development project with the same number of housing units, but with fewer wetland impacts and fewer of those housing units placed in vulnerable locations would better serve the public interest.

178.    For all of these reasons, the Corps' issuance of the Permit for the Cainhoy Plantation violated section 404 of the CWA, 33 U.S.C. § 1344, and its implementing regulations, 40 C.F.R. Part 230.[3]

### SECOND CLAIM FOR RELIEF

### (Violation of CWA – EPA Unlawfully Violated Section 404 of the CWA and Applicable Regulations)

179.    Plaintiffs incorporate by reference all preceding paragraphs.

180.    Pursuant to the U.S. Court of Appeals for the Fourth Circuit's decision in *Hanson*, "[i]t is quite clear that both the Corps and the EPA are responsible for the issuance of

---

[3] Pursuant to the Fourth Circuit's decision in *Hanson*, 859 F.2d at 315–16, the Corps' violations of the CWA in issuing the Permit are properly pleaded under the CWA citizen suit provision. 33 U.S.C. § 1365. In the alternative, however, the Corps actions in issuing the Permit were arbitrary, capricious, and in violation of the CWA, and hereby cognizable under the APA, 5 U.S.C. § 706(2).

permits under the CWA and enforcement of their terms. . . . The EPA is ultimately responsible for the protection of wetlands." 859 F.2d at 315–16.

181.     EPA failed to exercise its mandatory duty of oversight imposed by the CWA, including section 404.

182.     By failing to object to the issuance of the Permit for the Cainhoy Plantation or to veto the Permit, EPA has sanctioned the Corps' failures and abdicated its ultimate responsibility to protect wetlands.

183.     For these reasons, EPA's actions in approving the Cainhoy Plantation Permit violated section 404 of the CWA, 33 U.S.C. § 1344, and its implementing regulations, 40 C.F.R. Part 230.[4]

### THIRD CLAIM FOR RELIEF

**(Violation of NEPA and APA – The Corps Acted Arbitrarily and Capriciously and Not in Accordance with Law in Issuing the Decision Document and EA)**

184.     Plaintiffs incorporate by reference all preceding paragraphs.

185.     In an EA, the agency must take a hard look at the environmental impacts of the proposed activity, including direct, indirect, and cumulative impacts. 40 C.F.R. §§ 1502.1, 1508.7, 1508.8. The agency must also evaluate a reasonable range of alternatives. 42 U.S.C. § 4332(C)(iii), (E); 40 C.F.R. § 1508.9(b). An agency may decline to prepare an EIS only if it prepares an EA that takes a hard look at the effects of the action and makes a reasonable finding that there will be no significant impact.

---

[4] In the alternative, the EPA's failure to exercise its mandatory duty of CWA oversight constituted an "agency action unlawfully withheld or unreasonably delayed," in violation of the APA. 5 U.S.C. § 706(1).

186.    The Corps violated NEPA by preparing an EA that failed to take a hard look at the direct, indirect, and cumulative environmental impacts of the proposed Cainhoy Plantation; failed to examine a reasonable range of alternatives; and was not based on high-quality information and accurate analysis of the effects of the action.

187.    The Corps' issuance of the EA and Finding of No Significant Impact for the planned development are final agency actions that are arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law, 5 U.S.C. § 706(2)(A), (D), and violations of NEPA, 42 U.S.C. §§ 4321 *et seq.*

## FOURTH CLAIM FOR RELIEF

### (Violation of NEPA and APA – The Corps Acted Arbitrarily and Capriciously and Not in Accordance with Law in Failing to Prepare an EIS for the Cainhoy Plantation)

188.    Plaintiffs incorporate by reference all preceding paragraphs.

189.    NEPA requires federal agencies to conduct environmental reviews of major federal actions that may significantly affect the environment. 42 U.S.C. § 4332(C). If an action is likely to significantly affect the environment, an agency must prepare an EIS. *Id.*

190.    The significance of a major federal action is determined through the consideration of ten factors. 40 C.F.R. 1508.27 (1978).

191.    A finding of significance under any of the ten factors may require the preparation of an EIS.

192.    The proposed Cainhoy Plantation is significant under many of the ten factors to be considered under 40 C.F.R. §1508.27 (1978), including the unique risks posed regarding flooding and development within the floodplain; the degree to which the proposed action affects public health or safety; the project's impact on 180 acres of wetlands; and its impact on listed species, among other factors.

193.    The Corps failed to prepare an EIS for the Cainhoy Plantation.

194.    The Corps' failure to prepare an EIS for the Cainhoy Plantation constitutes an "agency action unlawfully withheld or unreasonably delayed," in violation of the APA. 5 U.S.C. § 706(1).

## FIFTH CLAIM FOR RELIEF

**(Violation of APA – The Service's Biological Opinion is Arbitrary, Capricious, and Not in Accordance with Law)**

195.    Plaintiffs incorporate by reference all preceding paragraphs.

196.    The Biological Opinion arbitrarily excluded, without explanation, the FMNF from the action area.

197.    The Biological Opinion acknowledged that the Cainhoy Plantation will degrade thousands of acres of RCW habitat adjacent to the FMNF, could drastically affect the Forest Service's ability to use prescribed fire, and will extirpate RCWs from the property, which provide fledgling recruitment to the larger FMNF demographic population.

198.    Despite this, the Service failed to consider impacts of the project on FMNF RCWs.

199.    The Biological Opinion failed to consider impacts of climate change on the local RCW population. "'[G]eneral[]' discussion of the effects of climate change [is] insufficient when other documents in the record hint[ ] at climate impacts within the action area." *Appalachian Voices*, 25 F.4th at 276 (citing *Wild Fish Conservancy v. Irving*, 221 F. Supp. 3d 1224, 1233–34 (4th Cir. 2016)).

200.    The Biological Opinion provided "safe harbor-like assurances" for the take of all future RCWs in the project area, yet reached its no-jeopardy determination based on take of only 11 RCW clusters currently on the property.

201.    The Biological Opinion's safe harbor assurances contradict the take limit included in the Incidental Take Statement. As a result, it is not clear whether take of more than 11 RCW clusters requires the Corps to reinitiate consultation.

202.    The Service's Biological Opinion is arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court:

A.    Declare that the Corps and EPA violated the CWA;

B.    Declare that the Corps violated NEPA and the APA;

C.    Declare that the Service violated the APA and ESA;

D.    Vacate the Corps' and EPA's section 404 Permit;

E.    Vacate the Corps' Environmental Assessment and Decision Document;

F.    Vacate the Service's Biological Opinion and Incidental Take Statement;

G.    Enjoin Defendants from taking any actions to dredge or fill wetlands under the Permit until Defendants comply with all the requirements of the CWA, NEPA, ESA, and APA;

H.    Grant Plaintiffs their costs of suit, including reasonable attorneys' fees to the extent authorized by law; and

I.    Grant Plaintiffs such further relief as the Court deems just and proper.

Respectfully submitted this 17th day of August, 2022.

/s/ Catherine M. Wannamaker
SC Bar Number: 12577
Christopher K. DeScherer
SC Bar Number: 77753
Emily C. Wyche
SC Bar Number: 105551
Lewis C. DeHope
SC Bar Number: 105160

Southern Environmental Law Center
    525 East Bay Street, Suite 200
    Charleston, SC 29403
    Telephone:    (843) 720-5270
    Facsimile:    (843) 414-7039

*Attorneys for Plaintiffs South Carolina Coastal Conservation League, Charleston Waterkeeper, and South Carolina Wildlife Federation*