IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| South Carolina Coastal Conservation League, *et al.*, | Case No. 2:22-CV-2727-RMG |
| Plaintiffs, | |
| v. | **ORDER AND OPINION** |
| United States Army Corps of Engineers, Charleston District, *et al.*, | |
| Defendants, | |
| Tract 1 Timber, LLC, *et al.*, | |
| Defendant-Intervenors. | |

Before the Court is Plaintiffs' motion for a temporary restraining order and preliminary injunction. (Dkt. No. 49). Federal Defendants and Defendant-Intervenors responded. (Dkt. Nos. 53, 54). Plaintiffs replied. (Dkt. No. 57). For the reasons set forth below, the Court denies Plaintiffs' motion.[1]

## I.    Factual Background

Plaintiffs move before this Court "to prevent irreparable harm caused by clearing and other site preparation and construction work" arising from Defendant-Intervenors' development of the Cainhoy Project, which spans "a 9,076-acre property in the City of Charleston and Berkeley County" which "[w]hen constructed, . . . will include at least 9,000 housing units and about 45,000 occupants." (Dkt. No. 49 at 2; Dkt. No. 48 ¶ 84). Developers of the Cainhoy Project applied for a Section 404 permit pursuant to the Clean Water Act ("CWA") on March 7, 2018, which the

---

[1] As a result, the Court need not address Defendant-Intervenor's motion for an injunction bond. (Dkt. No. 58).

1

Corps approved on May 6, 2022 following a four-year comment and review period. (Dkt. No. 49-5).  Developers originally "proposed to fill over 1,800 acres of wetlands, build 18,000 homes, and construct a 20-million square foot heavy industrial park" but "modified the project to instead fill 180 acres of wetlands (a 90% reduction), build 9,000 homes (a 50% reduction), and eliminate entirely the industrial park" after consultation with Federal Defendants, state agencies, community groups and African American historical organizations. (Dkt. No. 54 at 4-5).  The final approved permit also requires the Developers to "establish a sanctuary . . . to enhance and preserve about 650 acres of wetlands and 520 acres of uplands, along with preserving about 1,990 more acres of wetlands and 520 acres of uplands," among other special conditions. (Dkt. No. 49-5 at 194-205; Dkt. No. 54 at 6).  Plaintiffs filed suit to contest the permit approval on August 17, 2022, alleging violations of the CWA, Administrative Procedure Act ("APA") and National Environmental Policy Act ("NEPA"). (Dkt. No. 1).  Plaintiffs did not move for a temporary restraining order or preliminary injunction at that time.

Federal Defendants reinitiated environmental assessment of the Cainhoy Project in 2023 following the Fish and Wildlife Service's ("FWS") designation of the Northern Long-Eared Bat ("NLEB") as an endangered species, leading Developers to pause work on the development area in March 2023. (Dkt. No. 54 at 6; No. 37 at 3).  There have never been any documented NLEB sightings in Cainhoy.  The last recorded NLEB sighting in coastal South Carolina occurred in the neighboring Francis Marion National Forest (which spans 263,904 acres) in 2019.  (Dkt. No. 53 at 6).  However, in order to expedite the consultation process, Developers opted to assume the presence of NLEBs in the area given the presence of suitable habitat.  (Dkt. No. 53 at 8).  While development was paused pending completion of the reinitiated environmental review, Defendant-Intervenors retained two engineering firms to conduct acoustic surveys of swaths of the Cainhoy

2

property, which did not detect any NLEBs in the survey area. (Dkt. No. 53-4). Federal Defendants issued an amended Biological Opinion on July 3, 2024 containing an Incidental Take Statement ("ITS") for the NLEBs, which concluded the Cainhoy Project would not "appreciably reduce" the NLEBs' "reproduction, numbers and distribution." (Dkt. No. 49-4 at 78). The Corps issued a modified permit on July 12, 2024, which added special conditions to mitigate potential harm to NLEBs, including:

1. "develop[ing] a bat monitoring plan" in coordination with the FWS "for the duration of the Action";

2. "agree[ing] that the Service may visit the Action Area to ensure the Action is being completed as proposed";

3. "avoid[ing] operating loud machinery";

4. "agree[ing] that habitat removal for development by the permittee will occur outside of the provided sensitive timeframes (Summer Occupancy April 1 - July 15 and Winter Torpor December 15 - February 15)";

5. "adher[ing] to South Carolina Forestry [Best Management Practices] to prevent unintended habitat loss";

6. "avoid[ing] the harvesting of snags unless it is a human health hazard";

7. "minimiz[ing] tree removal, including of suitable roosting bat habitat, in excess of what is require to implement the Action safely and comply with regulatory obligations";

8. "avoid[ing] the use of artificial lighting within 1000 feet (ft) of confirmed bat roosting habitat from one half hour before official sunset times until one half hour after official sunrise times"; and

9. "install[ing] artificial bat roosts"

(Dkt. No. 49-9 at 4-5).

Developers resumed clearing activities upon completion of Federal Defendants' environmental assessment in July 2024. Plaintiffs moved for a temporary restraining order and preliminary injunction on August 1, 2024, arguing the Corps acted in an arbitrary and capricious manner by failing to publish an Environmental Impact Statement ("EIS") in violation of NEPA and through reliance on a Biological Opinion ("BiOp") and ITS issued by the FWS that fails to comply with the Endangered Species Act ("ESA"). (Dkt. No. 49).

## II.    Legal Standard

### A.    Review of Agency Actions

The APA directs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "without observance of procedure required by law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). A court reviews biological opinions and environmental impact statements under § 706 of the Administrative Procedure Act. *Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1, 12 (1st Cir. 2024). "[A]s a general rule, 'agency action, findings, and conclusions' will be set aside only when they are 'found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (quoting 5 U.S.C. § 706(2) (2000)). "Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Id.* "Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes 'a rational connection between the facts found and the choice made." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

4

### B. Injunctive Relief

The substantive standards for granting a request for a temporary restraining order and entering a preliminary injunction are the same. *See Virginia v. Kelly*, 29 F.3d 145, 147 (4th Cir. 1994) (applying preliminary injunction standard to a request for temporary restraining order). Both "are intended to meet exigent circumstances[.]" *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 84 (3d Cir. 1982). It "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "[T]he party seeking [either of these types of relief] must prove [its] own case and adduce the requisite proof, by a preponderance of the evidence, of the conditions and circumstances upon which he bases the right to and necessity for injunctive relief." *Citizens Concerned for Separation of Church & State v. City of Denver*, 628 F.2d 1289, 1299 (10th Cir. 1980).

A temporary restraining order or a preliminary injunction should issue only when the plaintiff can "(1) establish that [it is] likely to succeed on the merits, (2) that [it is] likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in [its] favor, and (4) that [injunctive relief] is in the public interest." *Winter*, 555 U.S. at 20. The burden is on the party seeking injunctive relief to show it is entitled to the relief, not the burden of the other party to show the movant is not entitled. *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 443 (1974).

"[A]ll four requirements must be satisfied." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009). Thus, even a strong showing of likely success on the merits cannot compensate for failure to show likely injury. *Winter*, 555 U.S. at 21-22. And, irreparable injury alone is insufficient to support equitable relief. *See id.* at 23 (holding irreparable injury was likely to occur, but holding injunctive relief was improper because of the burden on the

5

government and impact on public interest). In other words, "[a temporary restraining order or a] preliminary injunction shall be granted only if the moving party clearly establishes entitlement." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). "Given [the] limited purpose [of a temporary restraining order and a preliminary injunction], and given the haste that is often necessary ..., [they are] customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "Because [the] proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016), *vacated and remanded on other grounds*, 580 U.S. 1168 (2017).

### III. Discussion

#### A. Likelihood Of Success On The Merits

The Court begins by examining Plaintiffs' likelihood of success on their claims that Federal Defendants acted in an arbitrary and capricious manner in violation of the APA, ESA and NEPA by failing to prepare an EIS and relying on an unlawful ITS as the basis of the BiOp and Section 404 permit. For the reasons set forth below, the Court holds that Plaintiffs have not met their burden to show a likelihood of success on the merits on either claim.

##### 1. The Corps' Environmental Assessment

Plaintiffs argue "[t]he Corps violated NEPA by refusing to prepare an EIS analyzing and disclosing the significant environmental impacts of the massive Cainhoy development." (Dkt. No. 49 at 28). NEPA requires federal agencies to prepare an EIS that discusses the environmental

ramifications of "major Federal actions significantly affecting the quality of the human environment." *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1067 (9th Cir. 2014).   In evaluating significance, the Court is guided by ten factors including:

> unique characteristics of the geographic area such as proximity to . . . historic or cultural resources, . . . wetlands, wild and scenic rivers, or ecologically critical areas;" the potential for "loss or destruction of significant scientific, cultural, or historical resources;" the "degree to which the effects on the quality of the human environment are likely to be highly controversial;" the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," and "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under [the ESA].

40 C.F.R. § 1508.27(b)(3), (4), (5), (9) (1978).   "If an agency determines an EIS is not required, it must . . . issue a Finding of No Significant Impact ('FONSI'), briefly describing why the action will not have a significant effect on the human environment . . . ." *Id.* § 1508.13.   In determining whether an agency erred in failing to prepare an EIS, the reviewing court must ask  "whether the agency (1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its [FONSI or Environmental Assessment], (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum." *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011), *as amended* (Jan. 30, 2012); *see also Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 191–92 (4th Cir. 2009) ("Even where an EA determines that a proposed action will have a significant environmental impact, an agency may avoid issuing an EIS where it finds that mitigating measures can be taken to reduce the environmental impact of the project below the

7

level of significance."). "An agency's decision to rely on an Environmental Assessment instead of preparing an Environmental Impact Statement is entitled to deference from the courts." *Mt. Lookout-Mt. Nebo Prop. Prot. Ass'n v. FERC*, 143 F.3d 165, 172 (4th Cir. 1998).

Federal Defendants opted to issue an Environmental Assessment, rather than an Environmental Impact Statement, upon determining that proposed mitigatory actions contained in the Cainhoy Project's development plan would result in "less than significant impacts to the quality of the human environment." (Dkt. No. 49-5 at 213). Defendant-Intervenors explain "there is nothing to be gained by requiring an EIS" where "the agencies have taken an exhaustive look at the environmental consequences of the Cainhoy project over the last six years" resulting in a 221-page Environmental Assessment, 30,000 page administrative record, "two biological assessments, two biological opinions, two Section 7 consultations, two environmental assessments, and a permit and an amended permit." (Dkt. No 53 at 28). Plaintiffs contest this decision by citing numerous significant effects resulting from the project, including the "(1) destruction of over 180 acres of wetlands protected by the Clean Water Act ('CWA'); (2) clearing of over 3,900 acres of forested habitat on the site, resulting in the 'take' of two species listed as endangered under the Endangered Species Act ('ESA'); (3) impacts to the ecologically-critical Francis Marion National Forest ('the National Forest') and to historically significant African American settlement communities; and (4) placement of 45% of housing acreage within the 100-year floodplain while Charleston already struggles with rising seas." (Dkt. No. 49 at 1-2). Plaintiffs further argue that the FWS' findings of adverse impacts to the Red-Cockaded Woodpeckers ("RCWs") and NLEBs alone necessitate the preparation of an EIS.  (*Id.* at 29) (citing *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 879 (9th Cir. 2022)).

To obtain injunctive relief, Plaintiffs must show a substantial likelihood of success on their claim that Federal Defendants' determination not to issue an EIS was arbitrary and capricious.  On the Court's own review of the EA, Plaintiffs cannot meet this threshold.  Plaintiffs do not grapple with the rationality of Federal Defendants' determination that proposed protective measures for the RCWs and NLEBs, including continued efforts to translocate the RCWs and the development of a bat monitoring program, mitigate any material adverse effect on these species.  (Dkt. No. 49-4 at 79-87).  As one example, the FWS concluded that any take of the RCW population would "represent[] 2% of the FMNF primary core population" and "not appreciably reduce the likelihood of the Mid-Atlantic Coastal Plain recovery unit meeting its population goal," while "the portion of the habitat removal in the proposed Action constitutes a very small portion of the overall habitat available range-wide" of the NLEBs and other bats. (Dkt. No. 49-10 at 3).  In light of these findings, Federal Defendants amended the Section 404 permit to include seven additional conditions to mitigate the impacts on NLEBs, reasoning that these additional conditions "only further constrain the authorized work (to effectively further reduce any potential adverse impacts to threatened and endangered species)" and "[would] not result in significant individual or cumulative impacts on the human environment." (*Id.* at 11).  As a result, Federal Defendants did not alter their conclusion that "this permit action **will not** have a significant impact on the quality of the human environment" and "[t]herefore an Environmental Impact Statement **will not** be required."  (Dkt. No. 49-5 at 214) (emphasis in original); *see also Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009).  Plaintiffs have not demonstrated a substantial likelihood of success on their claim that this decision by Federal Defendants was irrational, and the Court declines to grant injunctive relief on this basis.

Plaintiffs also argue an EIS should have been prepared due to the Cainhoy Project's impacts on surrounding wetlands and historical areas. (Dkt. No. 49 at 30-31). The criticisms levied by Plaintiffs, including citation to a comment by the South Carolina Department of Natural Resources ("SCDNR") maintaining its view that the Cainhoy area should be preserved for conservation, are insufficient to demonstrate a likelihood of success on the merits on claim. (*See* Dkt. No. 49 at 30 (citing Dkt. No. 49-5 at 84)).[2] Rather than "repeated[ly] dismiss[]" the impacts of the Project, the Court considers the EA provides considerable discussion of the Project's impacts on the land and surrounding communities and responds to comments raised by Plaintiffs throughout the environmental comment and review period. (Dkt. No. 49-5 at 81-99). The Court is reminded that "[e]specially in matters involving not just simple findings of fact but complex predictions based on special expertise, 'a reviewing court must generally be at its most deferential.'" *Ohio Valley*, 556 F.3d at 192 (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983)). On the record before the Court, Plaintiffs have not shown clear entitlement to relief on their claim that Federal Defendants' failure to prepare an EIS was arbitrary and capricious. The Court denies injunctive relief on this claim.

2.   The FWS' 2024 BiOp

Plaintiffs' ESA claims concern the 2024 BiOp issued by the FWS. (*See* Dkt. No. 49-4). The ESA requires federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species."

---

[2] It is also noteworthy that there were not "an[y] efforts by SCDNR to sponsor or assist with acquisition of the property to further a conservation purpose or use for the Project Site." (Dkt. No. 49-5 at 84).

16 U.S.C. § 1536(a)(2).  Where an agency action is expected to have an effect on listed species or critical habitat, it must formally consult with the Fish and Wildlife Service. 50 C.F.R. § 402.14. "Broadly speaking, the object of consultation under the statute is for the [consulting] agency to determine whether the project will violate [Section 7's] prohibition on jeopardizing the continued existence of endangered and threatened species." *Ctr. for Biological Diversity v. Ross*, 613 F.Supp.3d 336, 339 (D.D.C. 2020).  "At the conclusion of the Section 7 consultation process, the consulting agency must issue a biological opinion—that is, a BiOp—'setting forth [its] opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat.'" *Id.* (quoting 16 U.S.C. § 1536(b)(3)(A)).  If in the course of "formulat[ing] its biological opinion" the FWS concludes that an agency action is "likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat," "any take resulting from the proposed action is subject to section 9 liability" which  makes it unlawful to "take" an endangered or threatened species, which means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1107 (9th Cir. 2012); 16 U.S.C. §§ 1532(19), 1538(a)(1)(B); 50 C.F.R. § 17.31(a) (extending Section 9 to prohibit the "take" of threatened species). Where FWS concludes that "*no* jeopardy or adverse modification is likely, but that the project is likely to result only in the "incidental take" of members of listed species, then the FWS will provide, along with its biological opinion, an incidental take statement authorizing such takings" that specifies "the impact [i.e., the amount or extent] of the incidental taking on the species," "the 'reasonable and prudent measures' that the FWS considers necessary or appropriate to minimize such impact," and "set forth 'terms and conditions' with which the action agency must comply to implement the reasonable and prudent

measures." *Id.* (quoting *Or. Natural Res. Council v. Allen*, 476 F.3d 1031, 1034 (9th Cir.2007));

16 U.S.C. § 136(b)(4).

The ESA requires that the ITS:

> (i)     specif[y] the impact of such incidental taking on the species,
>
> (ii)    specif[y] those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,
>
> (iii)   in the case of marine mammals, specif[y] those measures that are necessary to comply with section 1371(a)(5) of this title with regard to such taking, and
>
> (iv)    set[ ] forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

16 U.S.C.A. § 1536(4).  Where necessary, the agency may employ a "surrogate (e.g., similarly

affected species or habitat or ecological conditions) . . .  to express the amount or extent of

anticipated take." 50 C.F.R. § 402.14(i)(1)(i).  In doing so, the agency must "[d]escribe the causal

link between the surrogate and take of the listed species, explain[] why it is not practical to express

the amount or extent of anticipated take . . . and set[] a clear standard for determining when the

level of anticipated take has been exceeded." *Id.*

### a.   The Francis Marion National Forest

Plaintiffs fail to show a likelihood of success on their claim that the FWS' exclusion of the

263,903 acre Francis Marion National Forest from the Cainhoy Project action area was arbitrary

and capricious.  The ESA defines "action area" as "all areas to be affected directly or indirectly by

the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02.

Federal Defendants defined the action area as the 9,076 acre Cainhoy parcel, 3,906 acres of which

will be developed under the permit.  (Dkt. No. 49-4 at 10).[3]  Plaintiffs argue that the Cainhoy Project has impacted and will continue to impact the Francis Marion National Forest "by removing Woodpeckers from the forest and translocating them to properties in the ACE Basin and Hitchcock Woods," "impact[ing] the use of prescribed fire on the National Forest," and "creat[ing] edge habitat on the National Forest." (Dkt. No. 49 at 18-20).

Federal Defendants explained their reasoning for not including the Francis Marion National Forest in the action area in the BiOp.  Federal Defendants explain that prior translocations of the RCWs from the Francis Marion National Forest to other forests in South Carolina to stimulate population growth between 2013-2017 "were complete prior to the issuance of the Section 404 permit and could not be construed as a 'consequence' of permit issuance" and rather "considered in the environmental baseline as opposed to an effect of the action." (Dkt. No. 54 at 9; Dkt. No. 49-4 at 20-22).  Regarding the Cainhoy Project's potential impact on prescribed burning in the Francis Marion National Forest, Federal Defendants explain they "coordinated with the USFS to analyze the ability of FMNF to continue conducting prescribed fires on FMNF" and "anticipated that FMNF can continue to conduct prescribed fires as planned even with the proposed development in regard to smoke management." (Dkt. No. 49-4 at 8-9).  Federal Defendants also addressed the effect of edge habitat on the RCWs and NLEBs, clarifying that the "FWS concluded that the Cainhoy development will expand rather than create edge habitat for NLEBs" and that the RCW groups inhabiting this area are "considered healthy and designated as 'dense groups' and thus 'will not be disrupted of dispersal opportunities," which FWS flagged as "the primary cause of vulnerability in edge groups." (Dkt. No. 54 at 12 (citing Dkt. No. 49-4 at 63, 66)).  The FWS

---

[3] Of the remaining 5,170 undeveloped acres, 3,162 acres are protected in perpetuity. (*Id.*).

also conducted a neighborhood level analysis "to account for the potential adverse impacts of the Action on RCW demography through habitat loss or fragmentation at the neighborhood level" and determined that "[t]he FMNF population is not dependent on the Action Area population" in light of the fact that "[t]he FMNF population is recovered . . . and is healthy, viable, and robust, being one of the six (6) largest known RCW populations." (Dkt. No. 49-4 at 63). On this record, Plaintiffs have not shown clear entitlement to relief on their claim that Federal Defendants' exclusion of the Francis Marion National Forest from the Cainhoy Project's action area was arbitrary and capricious.

### b. *NLEB "No Jeopardy" Conclusion*

Plaintiffs fail to show a likelihood of success on their claim that Federal Defendants' "no jeopardy" conclusion for the NLEBs was arbitrary and capricious. Plaintiffs argue Federal Defendants "no jeopardy" conclusion was arbitrary and capricious because it "treat[ed] coastal habitat, which it acknowledges could serve as a 'refugium' for a species in steep decline from white-nose syndrome, as interchangeable with Bat habitat elsewhere in the state and country where white-nose syndrome is present and decimating Bat populations." (Dkt. No. 49 at 21). Per Plaintiffs, "[t]he Service was, at minimum, required to (1) explain its assumptions that Bats on Cainhoy can move to other locations in South Carolina where they have not been located ever before . . . and (2) explain how the devastating impacts of white-nose syndrome found in the Upstate would not reduce the survival or recovery of the Bats." (*Id.* at 22).

As the basis for its no jeopardy determination, the Corps cites the *de minimis* impact of tree removal on the potential habitat of the NLEBs, in light of the 12.86 million acres of forest land in South Carolina as of 2019, of which the action area comprises approximately 0.003%. (Dkt. No. 49-4 at 79). While the Corps concedes that "NLEB range in South Carolina does not span the

14

entire state," this enormous expanse of forest—some 263,904 acres of which are protected land within the neighboring Francis Marion National Forest—is substantial when compared to the 3,906 acres subject to development over a three-decade timeframe pursuant to this permit. *Id.* at 67. Federal Defendants also cite findings that white-nose syndrome has not been detected in the South Carolina portion of the East Coast Representation Unit and that displaced NLEBs will "relocate to the remaining forested land within South Carolina's portion of the NLEB East Coast RPU." (*Id.* at 31, 67). At this stage of the litigation, Plaintiffs have failed to demonstrate that Federal Defendants' no jeopardy determination was arbitrary and capricious. (*See id.* at 76).

### c. NLEB Recovery

Plaintiffs fail to show a likelihood of success on their claim that the BiOp was arbitrary and capricious due to its failure to analyze the impact of the Cainhoy Project on the recovery of the NLEBs. Plaintiffs argue the BiOp offers only a cursory reference to the Cainhoy Project's impact on the recovery of the NLEBs despite "the unique potential of coastal populations to act as the last buffer against white-nose syndrome." (Dkt. No. 49 at 23). Plaintiffs contrast the lack of discussion regarding NLEB recovery with the detailed section of the BiOp devoted to RCW recovery. (*Id.* at n.9 (citing Dkt. No. 49-4 at 63-64)). On the Court's review of the EA, Plaintiffs do not show a substantial likelihood of success on the merits of this claim. The BiOp cites mitigation efforts to foster the survival and recovery of the NLEB population, including "the permanent protection of approximately 3,162.3 [acres] of diverse and ecologically significant uplands and freshwater wetlands via restrictive covenants and a conservation easement" which contain "beneficial potential foraging, roost, and escape habitat" as well as the imposition of special conditions in the amended permit to insure the protection of bat habitat. (Dkt. No. 49-4 at 15, 85-86; Dkt. No. 49-10). Further, Federal Defendants considered that "the portion of the habitat

15

removal in the proposed Acton constitutes a very small portion of the overall habitat available range-wide" for the NLEBs and "is not likely to jeopardize the continued existence of the species" in light of the 12.86 million acres of remaining habitat in the state. (Dkt. No. 49-4 at 79). On this record Plaintiffs have not demonstrated a substantial likelihood of success on their claim that Federal Defendants acted in an arbitrary and capricious manner by failing to analyze the Cainhoy Project's impact on recovery of the NLEBs. This is especially the case where there has been no documented NLEB sighting in the Cainhoy area.

### d.  Incidental Take Statement

Plaintiffs fail to show a likelihood of success on their claim that the ITS was unlawful. Plaintiffs argue "[t]he BO provides no explanation of the causal connection between the habitat surrogate (acreage cleared) and take," "fails to adequately explain why a numeric limit on Bat take was impractical" and "sets an unenforceable trigger for the reinitiation of consultation." (Dkt. No. 49 at 24-28). Plaintiffs also complain the Fourth Circuit's holding in *Sierra Club v. United States Department of the Interior*, 899 F.3d 260 (4th Cir. 2018) "squarely rejects the approach taken in the Service's Incidental Take Statement ('ITS') here." (Dkt. No. 57 at 2).

The BiOp describes the causal link between the habitat surrogate and any incidental take of the NLEBs by explaining "the Service is using ac of forested habitats removed based on seasonality during the implementation of the action as surrogate measures for the anticipated amount or extent of take caused by the proposed Action" as "[t]ree removal will affect approximately 3,906 ac of NLEB roosting and foraging habitat" of which "approximately 2,930 ac will occur outside of the sensitive timeframes . . . [and] approximately 976 ac . . . are proposed to occur during any time of the year." (Dkt. No. 49-4 at 65-66, 81). Federal Defendants explained why it is impractical to quantify the take of NLEBs by citing their small size, occupation of habitat

where it is difficult to find them, nocturnality, formation of widely-disbursed colonies and likelihood that most take would be non-lethal (such as the "bats fleeing disturbances caused by proposed activities") or difficult to detect through traditional methods (finding dead or injured specimens). (*Id.* at 81). They explain that reinitiation of consultation will be triggered if the project exceeds the anticipated development of 3,906 acres, if any acreage is cleared within the sensitive seasons or if developers do not comply with the special conditions of the modified permit. (Dkt. No. 49-4 at 81, 86; Dkt. No. 49-9 at 3-4).

The FWS official assigned as Project Leader for the Cainhoy development explained that "the outcome of the consultation would have also been the same if the Applicants did conduct surveys and those surveys confirmed presence of NLEBs in the project area" because "[FWS] would have required the same avoidance and minimization measures for known habitat (as opposed to all suitable habitat), and it would have been impracticable to quantify take due to the nature of the take and the likelihood that any take would go undetected." (Dkt. No. 54-1, ¶ 17). She also elaborated upon FWS' decision to rely on a habitat surrogate for take, explaining "[t]he Service also did not provide take of the full 9,076 Action Area" so reinitiation would be triggered if any clearing occurred outside the 3,906 acre development area as well as if the limit for clearing during sensitive seasons was surpassed. (*Id.*, ¶ 18). Upon the Court's own review of the ITS and the FWS' decision-making process, Plaintiffs have not demonstrated a likelihood of success on the merits that the ITS' conclusion was irrational.

The Court also disagrees that the habitat surrogate employed by Federal Defendants in the ITS is on par with the surrogate struck down by the Fourth Circuit in *Sierra Club v. U.S. Department of the Interior*. In that case, the FWS identified a NELB hibernaculum within five miles of proposed construction of the Atlantic Coast pipeline. 899 F.3d at 281. The FWS had

17

previously promulgated a rule that allowed the incidental take of the NLEB where such take occurred more than 0.25 miles from the identified hibernaculum, so the ITS "addressed only the incidental take that [would] occur within a quarter mile" of that hibernaculum—an area spanning only 0.4 acres. *Id.* Despite the miniscule size of the incidental take area and the identification of a hibernaculum where NELBs were known to reside, the FWS failed to explain why calculating a numeric take was impractical. *Id.* Instead, the FWS attempted to set the incidental take trigger for NLEBs as a "small percent of individuals present within 0.4 acres" of the identified hibernaculum. *Id.* The Fourth Circuit rejected this habitat surrogate, reasoning that "it is impossible to know how many bats constitute a 'small percent'" and "[t]herefore, there is no clear and enforceable standard of take." *Id.* Because the ITS "lack[ed] an explanation as to why a numerical limit is impractical" as well as "a clear enforcement standard," the Fourth Circuit held that it failed to comply with the ESA. *Id.*

The facts here are clearly distinguishable. In contrast to the 0.4 acres of NLEB habitat at issue in *Sierra Club*, Federal Defendants' ITS contemplates the 9,076 acres of presumed NLEB habitat in the Cainhoy Action Area. Unlike in *Sierra Club*, where there was an identified NLEB hibernaculum within range of the pipeline, no NLEBs have ever been spotted in Cainhoy. Rather than offer a vague habitat surrogate with no enforceable trigger for reinitiation of consultation, Federal Defendants here explained the connection between seasonal clearing and limiting take of the NLEBs, the reasons why quantifying take of the NLEBs was impracticable in the expansive action area and set clear triggers for reinitiation of environmental consultation, including any failure by Developers to comply with the terms and conditions of the Amended Permit and exceeding restrictions on clearing. (Dkt. No. 49-4 at 14-15, 81-86).

18

In addition, Federal Defendants have "specif[ied] the impact of [the] incidental taking on the species," "those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact" and "the terms and conditions . . . that must be complied with by" the FWS and Developers to implement mitigation measures. 16 U.S.C.A. § 1536(4). In the BiOp, Federal Defendants acknowledged that "the proposed action is likely to have adverse effects to some individuals of the three (3) bat species (NLEB, TCB, and LBB)" including "(1) lethal take, harm, and/or harassment as a result of 976 ac of suitable habitat removal conducted at any time of year, including within sensitive timeframes, (2) lethal take, harm, and/or harassment as a result of 2,930 ac of suitable habitat removal conducted outside of the species' sensitive timeframes, and (3) lethal take, harm, and/or harassment as a result of 2,333 ac of forest management in the form of prescribed fire each year" but "determined that the species' reproduction, numbers, and distribution will not be appreciably reduced as a result of the proposed Action." (Dkt. No. 49-4 at 78). They included a summary table of effects on the NLEBs and other bat species, connecting the adverse actions (habitat removal) to the risk of NLEB injury or mortality, loss of habitat, fragmentation of maternity colony networks and disruption of feeding before listing proposed conservation measures (designating the majority of habitat removal outside of sensitive seasons, avoiding the use of loud machinery and artificial light at nighttime, avoiding the harvesting of snags where bats roost and complying with South Carolina Forestry Best Management Practices). (*Id.* at 77). The Amended Permit included these mitigation measures as mandatory terms and conditions attendant to the permit's issuance. (Dkt. No. 49-9). In light of the foregoing, Plaintiffs do not show a substantial likelihood of success on their claim that the BiOp was arbitrary and capricious by containing an unlawful ITS.

19

Plaintiffs have not shown a substantial likelihood of success on their claims, and are barred from obtaining injunctive relief.  However, the Court briefly touches upon the remaining factors a court considers in determining whether or not to grant injunctive relief.

### B.  Irreparable Injury

Plaintiffs are not likely to suffer irreparable harm in the absence of preliminary relief.  "A plaintiff seeking preliminary relief must 'demonstrate that irreparable injury is likely in the absence of an injunction' by a 'clear showing it will suffer harm that is neither remote nor speculative, but actual and imminent.'"  *Williams Ohio Valley Midstream, LLC v. Kittle*, No. 23-2185, 2024 WL 3325532, at *3 (4th Cir. July 8, 2024) (internal quotations omitted).  Plaintiffs highlight Defendant-Intervenors' resumption of clearing activities following the lifting of seasonal restrictions, arguing such activities will "destroy pristine Woodpecker and Bat habitat" and harm "Plaintiffs' members' business, aesthetic, and research interests . . . irraparabl[y]," ignoring that thousands of acres of habitat will be preserved within the total development area for conservation purposes and may continue to be enjoyed by Plaintiffs' members. (Dkt. No. 49 at 33; Dkt. No. 49-4 at 15-18; Dkt. No. 57 at 20; Dkt. No. 57-1).  Federal Defendants imposed additional mitigation conditions on Developers based on their agreement to assume that NLEBs may be present in the action area, notwithstanding that no NLEB has ever been found in Cainhoy and no NLEB has been seen in the neighboring 263,904 acre Francis Marion National Forest since 2019.  (Dkt. No. 53 at 6).  The amount of potential NLEB habitat that will be destroyed by the development is negligible (comprising just 0.003% of available habitat in the state for NLEBs). (Dkt. No. 49-4 at 79).  In regard to the RCWs, the FWS determined that the projected take of RCWs will "not appreciably reduce the likelihood of the Mid-Atlantic Coastal Plain recovery unit meeting its population goal" or "result in effects to the FMNF population's ability to maintain its recovered status." (*Id.*).  In

20

light of the above, the Court finds that Plaintiffs have not carried their burden to demonstrate an imminent threat of irreparable injury warranting injunctive relief.

### C.  Balance of Equities/The Public Interest

The Court considers that the balance of equities and public interest in this case favor Defendants.  "'Balancing the equities' when considering whether an injunction should issue, is lawyers' jargon for choosing between conflicting public interests." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 329 n.10 (1982) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609–610 (1952) (concurring opinion)).  Here, the relevant interests include not only the protection of endangered species and Plaintiffs' members' interests in enjoying the environment but the public interest in expanding access to housing and healthcare.

In the EA, Federal Defendants emphasize the development of "housing and commercial opportunities" as well as "recreational opportunities" to serve the Charleston metro area. (Dkt. No. 49-5 at 160-61).   For their part, Plaintiffs stress the need "to preserve the status quo" in order to protect wildlife in the area. (Dkt. No. 49 at 34).  The Court considers that the public interest weighs heavily in favor of Defendants.  The potential environmental harms posed by the Cainhoy Project are mitigated by the compensatory measures Federal Defendants have required developers to undertake.  (Dkt. No. 49-10).   Developers have entered contracts to create new housing and accompanying community services, including an 80,000 square-foot medical facility as well as an assisted living facility, which serve the public interest in expanding access to housing and healthcare. (Dkt. No. 53 at 34).  In the Court's view, enjoining the development of the Cainhoy Project would not serve the public interest.

## IV.  Conclusion

In light of the foregoing, the Court **DENIES** Plaintiffs' motion for a temporary restraining order and preliminary injunction. (Dkt. No. 49).

**AND IT IS SO ORDERED.**


                                           _s/ Richard M. Gergel
                                           Richard Mark Gergel
                                           United States District Judge

September 19, 2024
Charleston, South Carolina

22