IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| South Carolina Coastal Conservation League, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. Army Corps of Engineers, *et al.*, <br><br> Defendants, <br><br> Tract 1 Timber LLC, *et al.*, <br><br> Defendant-Intervenors. | Case No. 2:22-cv-2727-RMG <br><br><br> **ORDER AND OPINION** |

Before the Court are the Parties' cross-motions for summary judgment. (Dkt. Nos. 106, 108, 109). For the reasons set forth below, the Court grants summary judgment to Defendants on Plaintiffs' claims and dismisses this action with prejudice.

I.    **Background**

This suit involves a challenge by Plaintiff environmental groups under the Clean Water Act ("CWA") and the National Environmental Policy Act ("NEPA") to the U.S. Army Corps of Engineer's (the "Corps") issuance of a Section 404 permit authorizing Defendant-Intervenors to fill approximately 180 acres of wetlands pursuant to a mixed-use residential and commercial community on the Cainhoy Peninsula (the "Cainhoy Project"). (Dkt. No. 48, ¶ 1). Plaintiffs filed suit in this Court on August 17, 2022, arguing that the Corps acted in an arbitrary and capricious manner in issuing the permit and violated NEPA by relying on an Environmental Assessment ("EA") rather than an Environmental Impact Statement ("EIS") in approving the Cainhoy Project. (*See generally id.*).

1

In November 2023, the Court granted the Parties' joint motion to hold the case in abeyance pending renewed consultation under the Endangered Species Act. (Dkt. No. 39). The Court ordered the stay lifted in July 2024 following Federal Defendants' completion of their renewed environmental analyses, culminating in the Fish and Wildlife Service's (FWS) issuance of an amended Biological Opinion (Dkt. No. 49-4) and the Corps' issuance of an amended Section 404 permit (Dkt. Nos. 49-9, 49-10). (Dkt. No. 47). Plaintiffs filed an Amended Complaint on July 26, 2024 (Dkt. No. 48) and motion for a preliminary injunction on August 1, 2024 (Dkt. No. 49), which this Court denied on September 19, 2024 following a September 17, 2024 hearing. (Dkt. Nos. 74, 76). Plaintiffs' appeal of the Court's Order was denied by the Fourth Circuit on January 31, 2025. (Dkt. Nos. 79, 100).

The Parties' cross motions for summary judgment are ripe for this Court's review. (Dkt. Nos. 106, 108, 109).

## II.     Legal Standard

### A.  Review of Agency Actions

The APA directs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "without observance of procedure required by law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). A court reviews biological opinions and environmental impact statements under § 706 of the Administrative Procedure Act. *Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1, 12 (1st Cir. 2024). "Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). "Deference is due where the agency has

examined the relevant data and provided an explanation of its decision that includes 'a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "In determining whether agency action violates § 706(2)(A), we perform only the limited, albeit important, task of reviewing agency action to determine whether the agency conformed with controlling statutes, and whether the agency has committed a clear error of judgment." *Holly Hill Farm Corp. v. United States*, 447 F.3d 258, 263 (4th Cir. 2006) (internal citations and quotations omitted).

### B. Summary Judgment

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *See id.* Therefore, summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987).

"In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996). The movant bears the initial burden of demonstrating that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has made this threshold demonstration, the non-moving part must demonstrate specific, material facts exist that give rise to a genuine issue to survive the motion for summary judgment. *See id.* at 324. Under this standard, "[c]onclusory or

speculative allegations do not suffice, nor does a 'mere scintilla of evidence'" in support of the non-moving party's case. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (quoting *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999)).

### III. Discussion

#### A. CWA Jurisdiction

Federal Defendants argue that "Plaintiffs have abandoned their CWA citizen suit claim against EPA" which "also eliminates this Court's CWA citizen suit jurisdiction over the Corps" because "with no claim against EPA, there is no basis for joining the Corps under Federal Rule of Civil Procedure 20." (Dkt. No. 108 at 10). The CWA citizen suit provision provides that "any citizen may commence a civil action on his own behalf . . . against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." 33 U.S.C. § 1365(a)(2). Per Federal Defendants, "Plaintiffs raise no arguments whatsoever in support of their CWA citizen suit claim against EPA" in their summary judgment motion and have thus waived this argument. (Dkt. No. 108 at 10). Plaintiffs respond by explaining that "Plaintiffs simply made a strategic decision not to seek summary judgment against EPA after Plaintiffs determined that if they prevail against the Corps, they need not also prevail against the EPA to afford effective relief (and if Plaintiffs do not prevail against the Corps, they are unlikely to prevail against EPA)." (Dkt. No. 110 at 3).

The Court finds Plaintiffs' explanation perplexing, as Plaintiffs argue that both EPA and the Corps violated the CWA by approving a Section 404 permit authorizing Defendant-Intervenors' development activities on the Cainhoy Peninsula. (Dkt. No. 48, ¶¶ 201-16). The Fourth Circuit has recognized that "[i]t is quite clear that both the Corps and the EPA are responsible for the issuance of permits under the CWA and enforcement of their terms." *Nat'l*

*Wildlife Fed'n v. Hanson*, 859 F.2d 313, 315–16 (4th Cir. 1988).  In other words, Plaintiffs do not seek relief against the EPA that is separate and independent from that which they seek against the Corps, and it defies logic that they intentionally made a strategic decision to test their CWA claim first against the Corps and intentionally omitted their claims against EPA.

The Court declines to grant summary judgment based on a procedural technicality, and construes Plaintiffs' motion as brought against both EPA and the Corps.  However, as highlighted by Federal Defendants, Plaintiffs have abandoned their APA and ESA claims against FWS. (Dkt. No. 108 at 33).  Plaintiffs do not contest abandonment of these claims. (*See* Dkt. No. 110).  As a result, the Court deems Plaintiffs' claims against FWS waived and grants summary judgment in favor of FWS.  *Eady v. Veolia Transp. Servs., Inc.*, 609 F. Supp. 2d 540, 560–61 (D.S.C. 2009) ("The failure of a party to address an issue raised in summary judgment may be considered a waiver or abandonment of the relevant cause of action.").

The Court proceeds to consider the merits of the Parties' motions.

### B. Plaintiffs' CWA Claim

Section 404 of the CWA authorizes the Corps to issue permits authorizing the fill of navigable waters, including wetlands, under certain circumstances as set out by the Section 404(b)(1) Guidelines codified at 40 C.F.R. Pt. 230.  *See* 33 U.S.C. § 1344(b)(1).  Plaintiffs contend that Federal Defendants violated these guidelines by: (1) "fail[ing] to prove that the preferred alternative 5 was the [least environmentally damaging practicable alternative];' (2) "fail[ing] to conduct any analysis regarding whether the project will cause or contribute to significant degradation to waters of the United States;" and (3) "fail[ing] to adequately balance the benefits and detriments of Cainhoy." (Dkt. No. 106 at 17-18).

1. **LEDPA Determination**

Prior to issuing a section 404 permit to discharge or fill wetlands, the Corps must find that there is no practicable alternative which would have less adverse impact on the aquatic ecosystem—in other words, it must determine that the authorized plan is the "LEDPA." 40 C.F.R. § 230.10(a). Plaintiffs argue that Defendants "have failed to demonstrate that [the Cainhoy development plan], resulting in the filling of 180 acres of wetlands, is the LEDPA for the Cainhoy site." (Dkt. No. 106 at 18).

The Court first looks to the Cainhoy development's purpose in examining whether the Corps appropriately evaluated the alternative analyses in determining that the selected development plan was the LEDPA. *See Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 422 (4th Cir. 2012) ("[T]he purpose of the proposed action sets the contours for its exploration of available alternatives."). (Dkt. No. 108 at 13) (citing COE021626). The follow-on question is whether Defendant-Intervenors met their burden to "clearly demonstrate a lack of practicable alternatives." *All. For Legal Action v. U.S. Army Corps of Eng'rs*, 314 F. Supp. 2d 534, 543 (M.D.N.C. 2004).

The Corps defined the Cainhoy Project's purpose as:

> The overall project purpose is to construct a mixed use development to include residential, commercial, educational, office and government facilities with access to major traffic arteries that has the demographic support, zoning, infrastructure and access to schools and hospitals to help meet the needs of the growing Charleston, South Carolina metropolitan area.

(Dkt. No. 108 at 13) (citing COE021626).

Defendants conducted an extensive analysis involving nine off-site alternative sites and five on-site alternative design options for Cainhoy prior to determining that the chosen development plan for Cainhoy—"refined On-site Alternative 5"—was the least environmentally

damaging practicable alternative that met the project's purpose. (Dkt. No. 109 at 8-9). In their motion, Plaintiffs appear to argue that an alternative plan they submitted (the "Dover Plan") was the LEDPA. (Dkt. No. 106 at 20-25). The Corps directly addressed why the Dover Plan was not a viable and/or preferred alternative during the agency review process, reasoning:

> In summary, the Dover Plan, only **focusing on approximately 1,000 acres of the 9,000 plus acre site**, does not address what would happen to the remaining 8,000 acres, and **would not protect any wetlands from future impacts**. Furthermore, the Dover Plan does not take into account that the proposed impacts for a high density housing development **would have to be assessed with regard to project design allowances for a distinctly different project from what the applicants' have proposed**, and in turn, the practicability criteria and avoidance and minimization measures for the Dover Plan stem from a different statement of project purpose than what has been determined in Section 3.4, including the associated site selection/screening criteria in Section 5.1. Based thereon, the Dover Plan, as an alternative on-site configuration, was eliminated from further consideration.

(Dkt. No. 108 at 14-15) (citing COE021747) (emphases added). It is striking to the Court that the plan that Plaintiffs characterize as a better alternative would leave 8,000 acres vulnerable for future development. The Corps addressed this possibility head on, reasoning that "If the Dover Plan is repeated and extrapolated for the remaining 8,000 acres of the Cainhoy property, the resulting piecemeal approach would potentially lead to greater impacts to aquatic resources with less ecologically significant mitigation to offset these impacts." (COE023473). Defendant-Intervenors also highlight that the Dover Plan did not comply with current city zoning requirements, rendering it impracticable. (*Id.* at 14; *see also* Dkt. No. 109 at 21-23). Adding to the impracticability of the proposed design was the fact that the parcel of land on which the Dover Plan was concentrated was owned entirely by one entity (an out-of-state investment firm), excluding three Defendant-Intervenors from seeing any profits from development on Cainhoy after engaging in a decade-long

process in coordination with the Corps which required the four landowners to apply for a single permit, rather than engaging in the type of piecemeal development the Corps was concerned by (and which the Dover Plan threatens). (Dkt. No. 109 at 17-19).

By contrast, the permitted plan authorizes 181 acres of wetland impacts within the 9,076 acre project tract while protecting 95% of the wetlands on Cainhoy, leading the Corps to find that that "for every 1 acre of wetland that is impacted as a result of the Cainhoy Plantation development, approximately 13 acres will be protected and enhanced." (Dkt. No. 109 at 9, 11). The permitted plan serves to advance the project's purpose in supplying residential housing and services for the growing Charleston community while protecting the vast majority of natural resources on that land in perpetuity. In light of the foregoing, the Court finds that the Corps did not act in an arbitrary and capricious manner by determining that the permitted plan (refined On-site Alternative 5) was the LEDPA.

## 2. Significant Degradation to the Waters of the United States

The Section 404(b)(1) Guidelines provide that "dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." 40 C.F.R. § 230(1)(c). Plaintiffs argue that the Corps acted in an arbitrary and capricious manner by failing to determine whether the Cainhoy Project will cause or contribute to significant degradation of the waters of the United States. (Dkt. No. 106 at 26-27).

Federal Defendants maintain that they considered the impact of proposed compensatory mitigation in concluding that the Cainhoy Project will not cause or contribute to significant degradation, citing to various sources in the administrative record reflecting their deliberative

8

process. (Dkt. No. 108 at 29). They explain that "the Corps considered, among other things, the amount and type of wetlands impacted by the project, the amount and type of wetlands preserved by the project, and the Applicant's mitigation plan. . . . recogniz[ing] that the construction of the development will impact a relatively large acreage of jurisdictional wetlands" but "not[ing] that the available habitat onsite is considered common and abundant within the region, and the highest quality wetlands on the Cainhoy [ ] site have not only been avoided but will be preserved as part of the compensatory mitigation plan." (*Id.* at 19). The Corps also considered that Defendant-Intervenors' purchase of mitigation credits from the Clydesdale Mitigation Bank and mitigation plan "fully compensates for the lost function and value of the impacted wetlands and protect[s] the remaining wetlands from future impacts." (*Id.* at 20).

In light of Federal Defendants' extensive consideration and discussion of the Cainhoy Project's potential impacts to wetlands and measures to mitigate those impacts, the Court accords deference to the Corps' ultimate determination that the Cainhoy Project will not lead to significant degradation of the waters of the United States. *Ohio Valley Env't Coal.*, 556 F.3d at 192.

### 3. Public Interest Review

Plaintiffs contend the Corps' public interest review of the Cainhoy permit application was flawed, claiming "[t]he majority of the public benefits claimed by the Corps are not benefits at all, but rather mandatory requirements of the CWA" and citing reasonably foreseeable detriments of the Cainhoy Development, including constructing homes in flood prone areas and increased traffic on surrounding roadways, that overweigh the project's benefits. (Dkt. No. 106 at 29). Federal Defendants respond that "Plaintiffs incorrectly conflate land being undeveloped with land being preserved," noting that Defendant-Intervenors have placed the Point Hope Nature Sanctuary into a conservation easement the size of Sullivan's Island which "will constitute the largest

9

conservation easement in the City of Charleston." (Dkt. No. 109 at 25). As Defendant-Intervenors aptly note, "Cainhoy is a working timber farm, and it is bizarre for the Plaintiffs to argue that the Point Hope Nature Sanctuary does not constitute a 'new benefit' given that this private property could be timbered or developed instead of being preserved in perpetuity." (*Id.* at 26). As to the flooding impacts of the proposed development, the Corps explained in the EA that "Cainhoy also has strong resiliency because of its high percentage of wetlands and its numerous direct outfalls to tidal waters that will minimize the potential for heavy rains to overwhelm its infrastructure" and will be designed by the same engineering firm which designed flooding protections on Daniel Island to immense success. (*id.* at 26-27).

Given that the Corps carefully considered the benefits of housing, public services and conservation stemming from the Cainhoy Project as compared to foreseeable detriments such as increased flooding, the Court defers to the Corps' finding that the Cainhoy Project is in the public interest.

On review of the record, the Court finds that the Corps "examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made," entitling the Corps' permitting decision to deference. *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). Finding no clear error of judgment by the Corps, the Court finds that the Corps did not act in an arbitrary and capricious manner in issuing the Section 404 permit pursuant to the CWA.

### C. Plaintiffs' NEPA Claim

Plaintiffs contend that the Corps' decision to rely on an EA rather than an EIS violated NEPA. (Dkt. No. 106 at 30). The Court previously considered the Corps' decision not to prepare an EIS in its September 19, 2024 Order denying Plaintiffs' motion for a temporary restraining

order and preliminary injunction, reasoning that Plaintiffs had failed to show a substantial likelihood of success on their claim that the Federal Defendants' determination not to issue an EIS was arbitrary and capricious.[1] (Dkt. No. 76).

NEPA requires federal agencies to prepare an EIS that discusses the environmental ramifications of "major Federal actions significantly affecting the quality of the human environment." *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1067 (9th Cir. 2014). "If an agency determines an EIS is not required, it must . . . issue a Finding of No Significant Impact ('FONSI'), briefly describing why the action will not have a significant effect on the human environment . . . ." *Id*. § 1508.13. In determining whether an agency erred in failing to prepare an EIS, the reviewing court must ask "whether the agency (1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its [FONSI or Environmental Assessment], (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum." *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011), *as amended* (Jan. 30, 2012); *see also Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 191–92 (4th Cir. 2009) ("Even where an EA determines that a proposed action will have a significant environmental impact, an agency may avoid issuing an EIS where it finds that mitigating measures can be taken to reduce the environmental impact of the project below the

---

[1] Plaintiffs draw this Court's attention to Executive Order 14154, which revoked 1978 regulations promulgated by the Council for Environmental Quality and which were cited by this Court as factors to consider in determining the significance of a project's environmental impact in its Order denying Plaintiffs' motion for a preliminary injunction. (Dkt. No. 106 at 30). The Court was and remains guided by the language of NEPA in determining the Corps' compliance with that statute.

level of significance."). "An agency's decision to rely on an Environmental Assessment instead of preparing an Environmental Impact Statement is entitled to deference from the courts." *Mt. Lookout-Mt. Nebo Prop. Prot. Ass'n v. FERC*, 143 F.3d 165, 172 (4th Cir. 1998). "Thus, our review is limited to the question of whether [the Agency reasonably concluded that the [permitted action] would not significantly impact the quality of the human environment. *Id.*

Here, Federal Defendants issued an EA in May 2022 based upon a finding that the Cainhoy development would not have a significant impact upon the surrounding environment due to compensatory measures undertaken by Defendant-Intervenors. (Dkt. No. 49-5). After engaging in a period of renewed consultation under the ESA due to the uplisting of the Northern Long Eared Bat (NLEB) to endangered in January 2023, the Fish and Wildlife Service (FWS) issued an amended Biological Opinion in July 2024 determining that the Cainhoy Project did not jeopardize the NLEBs. (Dkt. No. 43-7). The Corps did not alter its earlier finding of no significant impact ("FONSI"), but added special conditions to an amended Section 404 permit. (Dkt. Nos. 49-9, 49-10).

In denying Plaintiffs' motion for a preliminary injunction to require Federal Defendants to vacate the EA and issue an EIS, this Court highlighted Federal Defendants' imposition of special conditions attached to the Section 404 permit to reduce any potential adverse impacts to the Norther Long Eared Bats and the ample discussion within the EA regarding Defendant-Intervenors' conservation efforts to mitigate impacts to the wetlands and surrounding communities as a result of the Cainhoy Project's construction. (Dkt. No. 76 at 9-10). In their present motion, Plaintiffs concede that Defendants have made efforts to mitigate such impacts, but argue that there have been no similar efforts to mitigate the "fact that the Development would make it more difficult to burn the National Forest, despite the inclusion of smoke easements on the peninsula; the

cumulative impacts from docks (erroneously relying on future, individual dock permits); the future failure of recently-widened Clements Ferry Road; and the increased traffic through the Phillips community." (Dkt. No. 106 at 34). They further contend that Federal Defendants entirely failed to consider sea level rise and marsh mitigation, "the eventual degradation of the waterways surrounding the peninsula due to the proliferation of individual docks that inevitably follow a waterfront community," and the potential that Clements Ferry Road will reach a failing level of service due to the Cainhoy Project. (Dkt. No. 106 at 33-34).

Defendants respond with ample citations to the administrative record reflecting the Corps' consideration of impacts arising from climate change and sea rise (Dkt. No. 108 at 26 n.13; Dkt. No. 109 at 31), marsh mitigation (Dkt. No. 108 at 27-28), future dock permitting and construction (Dkt. No. 108 at 29; Dkt. No. 109 at 31 (citing COE023401)), the impacts of tree clearing on the Francis Marion National Forest (Dkt. No. 108 at 31) and the increase of traffic through the historical African-American Phillips Community and on Clements Ferry Road (*id.* at 31-32). In the face of these citations, Plaintiffs' complaints that the EA was devoid of such analysis fall flat. Federal Defendants present a plethora of evidence that they carefully considered and weighed the impacts of the Cainhoy Project and concluded that, in light of mitigation measures undertaken by Defendant-Intervenors, the Project would not have a significant environmental impact on the surrounding human environment. Defendants have completed two biological assessments, two biological opinions, two Section 7 consultations, two environmental assessments and issued two Section 404 permits (original and modified following renewed consultation under the ESA), culminating in a 221-page Environmental Assessment and 147-page Biological Opinion. The Court is more than satisfied that, based on this extensive review, the Corps reasonably concluded

that its 221-page EA, rather than an EIS, was sufficient. As a result, the Court finds that Federal Defendants did not act in an arbitrary and capricious manner in violation of NEPA.

## IV. Conclusion

In light of the foregoing, Defendants' motions for summary judgment are **GRANTED** (Dkt. Nos. 108, 109) and Plaintiffs' motion is **DENIED** (Dkt. No. 106). Plaintiffs' claims are **DISMISSED WITH PREJUDICE**.

**AND IT IS SO ORDERED**.

                                          s/ Richard M. Gergel
                                          Richard Mark Gergel
                                          United States District Judge

May 22, 2025
Charleston, South Carolina